IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| TRAVIS AND JESSICA FRITZ as Third Party Beneficiaries of LAXMIJI, LLC individually and LAXMIJI, LLC d/b/a MOUNTAIN VISTA INN & SUITES, BHARAT PATEL individually and BHARAT PATEL d/b/a MOUNTAIN VISTA INN & SUITES, JAGRUTI PATEL, Plaintiffs, vs. LIBERTY SURPLUS INSURANCE CORPORATION and ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendants. | Docket No. 3:17-CV-433 **DISTRICT JUDGE THOMAS A. VARLAN** **CHIEF MAGISTRATE JUDGE H. BRUCE GUYTON** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This diversity action concerns a breach of contract claim in which Plaintiffs, third-party beneficiaries of an excess commercial general liability (CGL) insurance policy issued by Defendant St. Paul Fire and Marine, took a confessed judgment from St. Paul's insured, Laxmiji, LLC, for injuries resulting from carbon monoxide poisoning. Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Travis and Jessica Fritz move for summary judgment on St. Paul Fire and Marine Insurance Company's Fourteenth Affirmative Defense, which alleges that no coverage is available under an umbrella policy issued by St. Paul for bodily injury caused by "pollutants." (See Defs.' Am. Ans., ECF No. 43 at 11.)

This defense should fail as a matter of law. Illinois law should be applied to interpret the pollution exclusion. The Illinois Supreme Court, like courts of many states, has long held that a so-called "total pollution exclusion" like that in the St. Paul Umbrella Policy cannot bar coverage for injuries resulting from carbon monoxide exposure.

## FACTUAL BACKGROUND

This motion concerns the viability of the following affirmative defense asserted by Defendants:

**Fourteenth Defense**

No coverage is available under the St. Paul Umbrella Policy for the damages awarded in the Underlying Action by virtue of Exclusion S, which bars coverage for bodily injury arising out of the discharge, dispersal, seepage, migration, release or escape of "pollutants."

(Defs.' Am. Ans., ECF No. 43, at 11.)

The facts necessary to resolve this motion are undisputed. On December 23, 2014, Plaintiffs filed a lawsuit against Laxmiji, LLC, a Tennessee corporation, and its owners for serious, permanent injuries they sustained while staying on Laxmiji's premises at the Mountain Vista Inn and Suites in Pigeon Forge, Tennessee ("the hotel") on February 14, 2014. (Am. Compl., ECF No. 25 at 2–3.) The injuries were caused by a pool heating and ventilation system, which malfunctioned and emitted carbon monoxide that poisoned the Fritzes as they slept. (*Id.* at 2.)

As fire and police department reports show, Pigeon Forge Fire Department and emergency response personnel arrived at the scene at 10:42 AM on February 15, 2014 after being called due to symptoms being experienced by the Fritzes. (Suggs Decl., Ex. 1 at 1.) After testing in the Fritzes' first-floor revealed carbon monoxide present at 275 ppm, the

premises were evacuated. (*Id.* at 2.) Testing in two second-floor rooms showed the presence of carbon monoxide at 60 ppm, while testing in two third-floor rooms showed levels of 15 ppm. (*Id.*) No carbon monoxide was detected above the third floor of the hotel. (*Id.*) There were no reports of carbon monoxide being detected outside the building or in other surrounding structures. (*See id.*; *see also* Suggs Decl., Ex. 2 at 3.)

Fire Department personnel investigated the basement of the hotel, noted concentrations of carbon monoxide at 560 ppm, and determined that the carbon monoxide was being emitted as a result of an improperly installed pool heater vent. (Suggs Decl., Ex. 1 at 2.) The gas was shut off and the basement ventilated. (*Id.*) According to a police report, the hotel was cleared for re-occupancy at 11:50 AM on February 15—just over an hour after Fire Department personnel arrived. (*See* Suggs Decl., Ex. 3 at 2.) In total, guests in four rooms, out of approximately 28 total guest rooms in the hotel, complained of symptoms consistent with carbon monoxide exposure. (*See id.*) There is no evidence guests complained of such symptoms before February 15, 2014. (*See* Suggs Decl., Ex. 2 at 2.)

As Plaintiffs' environmental science expert, Timothy R. McAuley, concluded:

> It is clear that the event which injured Mrs. Fritz was limited in scope, to a few rooms of the motel, and in time, to the day in question. There is no allegation that the carbon monoxide escaped into the entire motel, or into the surrounding environment. The impact was minimal in terms of the number of persons involved, although unfortunately not in severity to Mrs. Fritz.

(*Id.*)

Two CGL policies covered Laxmiji at the time. The first, an underlying policy, was issued by Liberty Mutual, which has been dismissed as a defendant. The second was issued by Defendant St. Paul Fire & Marine Insurance Company (the "Umbrella Policy"). (*See*

3

Suggs Decl., Ex. 4.) The declarations page of the Umbrella Policy designates the named insured as "Community Associations PG and Its Designated Members (LRO)." (*Id.* at 12.)[1]

In its Amended Answer, St. Paul "admits it issued an umbrella liability insurance policy to Community Associations, PG Inc. and that Laxmiji, LLC is a named insured thereunder." (ECF. No. 43 at 5.) According to the Umbrella Policy, Community Associations, PG is

> a "Purchasing Group," As Defined Under Federal Law [15 U.S.C. § 3901 et seq.], Formed To Purchase Liability Insurance On A Group Basis For Its Members To Cover The Similar Or Related Liability Exposure(s) To Which The Members Of PG Are Exposed By Virtue Of Their Related, Similar, Or Common Business Or Service. Members Do Not Share Limits And Each Member Is Provided With Its Own Policy &/Or EOI.

(Suggs Decl., Ex. 4 at 5.) The address given for Community Associations is a Chicago, Illinois address. (Suggs Decl., Ex. 4 at 12.) Community Associations is an Illinois corporation and was originally incorporated under the laws of Illinois in 2004. (Suggs, Decl., Ex. 5.)

The agent listed on the Umbrella Policy is McGowan and Company, Inc. (*Id.* at 12.) St. Paul indicates that McGowan was a program administrator relative to Community Associations PG, Inc. (Suggs Decl., Ex. 6 at 2.) As St. Paul acknowledges, Laxmiji purchased the Umbrella Policy through Madison Insurance Group, Inc. (*Id.* at 2–3.) Madison Insurance Group operated under an agency agreement with St. Paul. (*Id.*) (Whether the Madison-St. Paul agency agreement is relevant to this case is disputed. This issue is not germane to the present motion, however.)

---

[1] Page numbers of the Umbrella Policy cited herein reflect the page numbers assigned by the ECF system.

4

Madison Insurance Group appears to have purchased the policy acting through Appalachian Underwriters, a wholesale broker. (*Id.* at 2.) Endorsements to the Umbrella Policy list Laxmiji, LLC as a named insured (Suggs Decl., Ex. 4 at 6) and gives the address of Mountain View Inn and Suites as an insured location (*id.* at 8).

Other than the Tennessee addresses provided in said endorsements, the Umbrella Policy never mentions Tennessee or references Tennessee law. By contrast, the Umbrella Policy contains five endorsements or other policy forms that reference Illinois: the "Illinois Amendatory Endorsement," the "Illinois Amendment of Cancellation Notice," the "Illinois Punitive Exemplary or Multiple Damages and Fines or Penalties Exclusion Endorsement," the "Claims-Made Coverage and Extended Reporting Period Endorsement – Illinois," and the "Abuse or Molestation Exclusion Endorsement – Illinois" (*Id.* at 13. These endorsements are contained at pages 39, 40, 53, 59, and 63, respectively.) No other states are referenced among the titles of these endorsements. (*See id.* at 13.) The Umbrella Policy contains no express choice-of-law provision, and does not otherwise reference the law of any other state.

The Umbrella Policy covers claims alleging "bodily injury." (*Id.* at 16.) "Bodily injury" includes "any physical harm, sickness or disease to the physical health of other persons." (*Id.* at 20.) Bodily injuries caused by "pollution" are excluded. The pollution exclusion reads as follows:

> **S. Pollution**
>
> 1. **Bodily Injury, Property Damage or Personal Injury or Advertising Injury** arising out of the actual alleged or threatened discharge, dispersal seepage, migration, release or escape of **Pollutants** anywhere in the world;
>
> 2. Any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that we, the **Insured** or any other person or

5

organization test for, monitor, clean-up, remove, contain, treat, detoxify, respond to, neutralize or assess the effects of **Pollutants;** or

3. Any loss, cost or expense arising out of any **Claim or Suit** by or for any governmental authority or any other person or organization for damages arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or responding to or assessing in any way **Pollutants.**

(*Id.* at 30.)

The policy defines "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and Waste." (*Id.* at 24.)[2] The policy does not contain the words "carbon monoxide."

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Under Tennessee law, "the scope of coverage and the insurer's duty to defend are questions of law, which can appropriately be resolved by a summary judgment when, as is the situation in the instant action, the relevant facts are undisputed." *Trinity Universal Ins. Co. v. Turner Funeral Home, Inc.*, No. 1:02-CV-083, 2003 WL 23218046, at *3 (E.D. Tenn. Dec. 12, 2003).

---

[2] "**Waste** includes materials which are intended to be or have been recycled, reconditioned or reclaimed." (*Id.* at 25.)

The party moving for summary judgment may satisfy its initial burden of proving the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325. Although hearsay evidence may not be considered on a motion for summary judgment, *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999), evidentiary materials presented to avoid summary judgment otherwise need not be in a form that would be admissible at trial. *Celotex*, 477 U.S. at 324; *Thaddeus-X v. Blatter*, 175 F.3d 378, 400 (6th Cir. 1999).

Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. An appellate court reviews a ruling on a motion for summary judgment de novo. *Spirit Airlines v. Northwest Airlines, Inc.*, 431 F.3d 917, 930 (6th Cir. 2006).

## ARGUMENT

### I. Illinois law applies to the pollution exclusion.

A Tennessee federal district court sitting in diversity applies Tennessee's choice of law rules. *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998). A claim by an insured against his or her insurance carrier is "based in contract law." *Nelson v. Nelson*, 409 S.W.3d 629, 632 (Tenn. Ct. App. 2013). Tennessee's choice of law rules with respect to contracts "provide that rights and obligations under a contract are governed by the law of that state with the view to which it is made and that the intentions of the parties in this respect to be gathered from the terms of the instruments and all of the attending circumstances control." *First Am.*

7

*Nat. Bank of Nashville v. Automobile Ins. Co.*, 252 F.2d 62, 64 (6th Cir. 1958). Circumstances typically considered by courts in determining the parties' intent include whether the policy contains endorsements or other provisions specifically intended to comply with the law of a particular state, whether the policy references the law of a particular state, and the state where the insurance contract was issued or delivered. *NGK Metals Corp. v. Nat'l Union Fire Ins. Co.*, No. 1:04-CV-56, 2005 WL 1115925, at *5 (E.D. Tenn. Apr. 29, 2005).

In the absence of evidence of the parties' intent as to which substantive law should apply, Tennessee courts follow the *lex loci contractus* doctrine in insurance coverage disputes. *Philadelphia Indemnity Insurance Company v. FedEx Freight, Inc.*, 297 F.Supp.3d 795, 802 (W.D. Tenn. 2017). Under that doctrine, the substantive law of the state where the insurance policy was issued and delivered controls. *Id.* It is not a requirement, however, that the contract be both issued and delivered in a particular state in order for that state's law to apply. *See Health Link Servs., L.L.C. v. U.S. Risk Underwriters, Inc.,* No. 06-02180, 2007 WL 9643298, at *4–5 (W.D. Tenn. Aug. 30, 2007) ("Despite the apparent requirement that the contract be both issued and delivered in a certain state for that state's substantive law to apply, the Tennessee Court of Appeals has held that the place of delivery alone is sufficient.") (citing *Mutual Life Ins. Co. of New York v. Templeton*, 362 S.W.2d 938, 942 (Tenn. Ct. App. 1962)).

The fact that a Tennessee plaintiff is an additional insured on a policy does not make Tennessee law govern if the policy is issued to a named insured in another state. *Clark Const. Grp., Inc. v. Eagle Amalgamated Serv., Inc.*, No. 01-2478-DV, 2005 WL 2092998, at *3 (W.D. Tenn. Aug. 24, 2005) ("Here, the insurance policy was issued by Defendant and delivered to Eagle, the primary insured. Both Defendant and Eagle are located in Florida, and it is

undisputed that the policy was delivered to Eagle in Florida. Although Plaintiff, who is located in Tennessee, is additionally insured on the policy and the policy was delivered to Plaintiff in Tennessee, Plaintiff is only an ancillary beneficiary to the policy. Therefore, the Court holds that Florida's contract laws apply.")

A policy intended to cover a number of insureds is considered a single policy. *See Burns v. Aetna Cas. & Sur. Co.*, 741 S.W.2d 318, 322 (Tenn. 1987) ("A fleet insurance policy, designed to cover a number of vehicles, is considered to constitute a single contract. The undisputed proof in the present case is that the policy in question was issued in Hartford, Connecticut and delivered to the insured in Providence, Rhode Island through a broker in Boston, Massachusetts. It is not a Tennessee contract, in our opinion, even though it is obviously a comprehensive fleet policy designed to meet the insurance needs of the named insured and its employees in each of the states in which covered vehicles were utilized or garaged.")

Here, the Umbrella Policy indicates that St. Paul and the primary named insured, Community Associations, intended that Illinois law apply to the contract. The policy has four endorsements that are apparently intended to bring the contract in conformance with Illinois law. (*See* Suggs Decl., Ex. 4 at 13, 39, 40, 53, 59, and 63.) There are no endorsements or other provisions that reference the laws of other states. The address of Community Associations, is an Illinois address. There is no reference in the policy to the law of Tennessee or any evidence that the parties intended to be bound by the laws of Tennessee. Hence, "[n]othing in any of the insurance policies indicates that the parties envisioned performance in accordance with the laws of Tennessee." *NGK Metals Corp. v. Nat'l Union Fire Ins. Co.*, No. 1:04-CV-56, 2005 WL 1115925, at *7 (E.D. Tenn. Apr. 29,

2005). The pollution exclusion should thus be interpreted in accordance with Illinois law.

The result is the same even if the Court were to determine that it cannot ascertain the intent of the parties regarding the law governing the insurance policy. The Illinois address and Illinois location of the primary named insured, Community Associations, gives rise to a strong inference that the insurance contract was executed and delivered in Illinois. The doctrine of *lex loci contractus*, as applied to insurance contracts by Tennessee courts, indicates that Illinois law should be applied.

**II.    Illinois law requires that pollution exclusions be construed in favor of coverage for injuries caused by carbon monoxide exposure.**

*American States Insurance Company v. Koloms*,[3] an Illinois Supreme Court decision, provides the rule of decision on whether the pollution exclusion in the Umbrella Policy precludes coverage. In Illinois, as elsewhere, a court's primary objective in interpreting the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement. *Id.* at 75. Policy terms that are plain and unambiguous should be given their plain and ordinary meaning. *Id.* Policy terms that are susceptible to more than one meaning are construed strictly against the insurer who drafted the policy. *Id.* Importantly, "provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer." *Id.* Courts should "construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Id.*

*Koloms* concerned a coverage dispute arising out of "a standard-form CGL policy" for carbon monoxide poisoning of commercial tenants resulting from a negligently

---

[3] 687 N.E.2d 72 (Ill. 1997).

10

maintained furnace. *Id.* at 74. American States reserved a right to contest coverage on the basis of an "absolute pollution exclusion" in the policy, which was substantively identical to the pollution exclusion in the Umbrella Policy at issue in this case:

> "This insurance does not apply to . . . Bodily injury' or 'property damage' arising out of actual, alleged or threatened discharge, dispersal, release or escape of pollutants: (a) At or from premises you own, rent or occupy."

*Id.*

After a comprehensive survey of case law interpreting the pollution exclusion and the historical development of the pollution exclusion, the Illinois Supreme Court held in *Koloms*, with one dissenting vote, that the exclusion should not be read to apply to carbon monoxide. As the court held, "we agree with those courts which have restricted the exclusion's otherwise potentially limitless application to only those hazards traditionally associated with environmental pollution." *Koloms*, 687 N.E.2d at 79. An opinion quoted from by the *Koloms* case illustrates the "potentially limitless application" of a "purely literal interpretation"[4] of a standard "total" CGL pollution exclusion:

> "Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution."

*Id.* at 77 (quoting *Pipefitters Welfare Educational Fund v. Westchester Fire Insurance Co.,* 976 F.2d 1037, 1043 (7th Cir.1992)).

---

[4] *Id.* at 79.

Reviewing the drafting history of the exclusion and its use of terms of art particular to environmental law (e.g., "discharge," "dispersal," "release," and "escape"), the court concluded that it "reveals an intent on the part of the insurance industry to so limit the clause" to situations within the context of "traditional environmental contamination" and "environmental litigation." *Id.* at 81. Hence:

> Given the historical background of the absolute pollution exclusion and the drafters' continued use of environmental terms of art, we hold that the exclusion applies only to those injuries caused by traditional environmental pollution. <u>The accidental release of carbon monoxide in this case, due to a broken furnace, does not constitute the type of environmental pollution contemplated by the clause.</u>

*Id.* at 82 (emphasis added). The court expressed its concern at the "overbreadth in the language of the exclusion as well as the manifestation of an ambiguity which results when the exclusion is applied to cases which have nothing to do with 'pollution' in the conventional, or ordinary, sense of the word." *Id.* at 79. The court would "be remiss, therefore, if we were to simply look to the bare words of the exclusion, ignore its *raison d' être,* and apply it to situations which do not remotely resemble traditional environmental contamination." *Id.* at 81. In sum, the court concluded:

> The pollution exclusion has been, and should continue to be, the appropriate means of avoiding the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment.* We think it improper to extend the exclusion beyond that arena.

*Id.* (citation and internal quotation marks omitted).

Numerous other jurisdictions have also held that pollution exclusions in CGL policies do not preclude coverage for injuries resulting from the release of carbon monoxide. *See Stoney Run Co. v. Prudential-LMI Commercial Ins. Co.*, 47 F.3d 34 (2d Cir. 1995) (applying New York law); *Regional Bank of Colorado, N.A. v. St. Paul Fire and Marine Ins. Co.*, 35 F.3d

12

494 (10th Cir. 1994) (applying Colorado law); *Richardson v. Nationwide Mut. Ins. Co.*, 826 A.2d 310 (D.C. 2003) (vacated due to settlement after grant of rehearing en banc); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679 (Ky. Ct. App. 1996); *Western Alliance Ins. Co. v. Gill*, 686 N.E.2d 997 (Mass. 1997); *Century Sur. Co. v. Casino West, Inc.*, 329 P.3d 614 (Nev. 2014); *Kenyon v. Security Ins. Co. of Hartford (DPIC Companies)*, 163 Misc. 2d 991, 626 N.Y.S.2d 347 (Sup 1993); *Andersen v. Highland House Co.,* 757 N.E.2d 329 (Ohio 2001); *In re Idleaire Technologies Corp.*, 2009 WL 413117 (Bkrtcy. D. Del. Feb. 18, 2009) (applying Tennessee law); *Donaldson v. Urban Land Interests, Inc.*, 564 N.W.2d 728 (Wis. 1997).[5]

In this case, the pollution exclusion is nearly identical to that at issue in *Koloms*, and the circumstances of the underlying occurrence also involve a malfunctioning heating system that resulted in carbon monoxide poisoning in a commercial building. Although the interpretation of the scope of an exclusion is a question of law, the factual circumstances in this case confirm the inapplicability of the pollution exclusion to carbon monoxide poisoning. The undisputed facts show (1) the hotel was cleared for occupancy a little over an hour after fire department personnel arrived on the scene; (2) guests in four rooms out of approximately 28 were affected; (3) no carbon monoxide was present above the third floor of the hotel; and (4) there was no report of carbon monoxide contamination in the area outside the hotel. (*See* pp. 2–3, *supra*.) The limited scope of the carbon monoxide release and its rapid correction through ventilation once it was recognized distinguishes it from pollution events, which "are understood in the exposure science community as the addition

---

[5] Some other states have held that carbon monoxide is a pollutant that falls within a pollution exclusion in a CGL policy. *See, e.g.*, *Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90 (Ga. 2008); *Bituminous Cas. Corp. v. Sand Livestock Systems, Inc.*, 728 N.W.2d 216 (Iowa 2007); *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628 (Minn. 2013).

13

of a substance, that is put into the environment at a rate faster than it can be dispersed, diluted, decomposed, recycled, and/or held in a harmless form." (Suggs Decl., Ex. 2 at 4.) Thus, carbon monoxide is not a "pollutant" under the St. Paul Umbrella Policy, and the pollution exclusion in the Policy cannot preclude coverage for Plaintiffs' injuries.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant summary judgment for Plaintiffs on Defendant's Fourteenth Affirmative Defense, and afford any other relief that the Court may deem just and proper.

## REQUEST FOR HEARING

Plaintiffs respectfully request a hearing on this motion.

Respectfully submitted,

Dated: April 3, 2019

/s/ Kenneth M. Suggs
Kenneth M. Suggs (*pro hac vice*)
JANET, JANET & SUGGS, LLC
500 Taylor Street, Suite 301
Columbia, SC 29201
(803) 726-0050 TEL
(803) 727-1059 FAX
ksuggs@jjsjustice.com

Sidney Gilreath (#2000)
GILREATH & ASSOCIATES, PLLC
550 Main Avenue, Suite 600
Knoxville, TN 37902
(865) 637-2442 TEL
(865) 971-4116 FAX
gilknox@sidgilreath.com

*Attorneys for Plaintiffs*

---

[6] Even if Tennessee law were to be applied, the result would likely be the same. *See In re Idleaire Technologies Corp.*, 2009 WL 413117 (Bkrtcy. D. Del. Feb. 18, 2009) (applying Tennessee law to hold that coverage for injuries due to carbon monoxide poisoning is not barred by a standard pollution exclusion in a CGL policy).

14