## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

TRAVIS AND JESSICA FRITZ As Third )
Party Beneficiaries of LAXMIJI, LLC )
individually and LAXMIJI, LLC d/b/a )
MOUNTAIN VISTA INN & SUITES, )
BHARAT PATEL individually and )
BHARAT PATEL d/b/a MOUNTAIN ) **Docket No. 3:17-CV-00433**
VISTA INN & SUITES, JAGRUTI PATEL, )
)
    Plaintiffs, ) **CHIEF DISTRICT JUDGE VARLAN**
) **MAGISTRATE JUDGE GUYTON**
)
v. )
)
ST. PAUL FIRE AND MARINE )
INSURANCE COMPANY, )
)
    Defendant. )

---

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

COMES NOW St. Paul Fire & Marine Insurance Company ("St. Paul"), by and through

counsel, and submits this Memorandum in Support of its Motion for Summary Judgment.

## INTRODUCTION

Plaintiffs, Jessica and Travis Fritz (the "Fritzes"), filed this case against St. Paul to collect

on a $20 million consent judgment that St. Paul was not party to or even aware of until the filing

of this lawsuit. The Fritzes were not insured by St. Paul; they were plaintiffs in a separate

underlying lawsuit against a hotel insured by St. Paul involving injuries allegedly sustained from

carbon monoxide poisoning at the hotel. The hotel never provided St. Paul with notice of the

underlying occurrence, claim, or lawsuit as required by the insurance policy. Instead, the first

time St. Paul received any notice was when St. Paul was served with the complaint in this

lawsuit, *over 3 years after the carbon monoxide incident.* Now, despite the lack of notice and not

having the opportunity to provide a defense to its insured, St. Paul is forced to defend against a $20 million consent judgment that far exceeds the $5 million limit under the policy.

That consent judgment is invalid as a matter of law because the Fritzes' pain and suffering damages far exceeded Tennessee statutory caps on noneconomic damages. The damages were also not based on an actual trial or even fair negotiations, and instead, were the same, un-tested damages from a default judgment that had been entered against the insured and the insured's owners; the consent judgment and accompanying settlement were used to eliminate the owners' personal liability. This process runs afoul of basic principles of fairness and due process and should be seen for what it is, a sham attempting to foist liability on St. Paul for an incident that is not even covered by the policy.

St. Paul should be granted summary judgment on the asserted breach of contract claim. St. Paul did not breach its policy because it had no duties under the policy since the insured failed to provide notice to St. Paul per the policy's terms. Further, the consent judgment represented a voluntary assumption of liability, an improper legal action against St. Paul, and was entered without notice or the consent of St. Paul, all in violation of the policy's terms. Even if notice had been provided, St. Paul had no duty to defend or indemnify the insureds for a carbon monoxide event because it was excluded under the policy's pollution exclusion. The Fritzes cannot escape the impact of these defenses among others. As alleged assignees of the policy, the Fritzes have no more rights than the insured who was in breach of the policy, and their complaint should be dismissed as a matter of law.

## BACKGROUND

*The Insured and its Policies.*

Laxmiji LLC, d/b/a "Mountain Vista Inn & Suites" ("Laxmiji" or the "Hotel") was insured by Liberty Surplus Insurance Corp. ("Liberty") through an underlying commercial

general liability policy with limits of $1 million. (2d Am. Compl. ¶¶ 22, 54, ECF Doc. 25.) Laxmiji was also insured by St. Paul through an umbrella, or excess, program of insurance for members of Community Associations PG, Inc. (the "Program"). (*Id*. ¶¶ 28, 31.) The St. Paul policy no. ZUP14S9493712NF-52908 (the "Policy") was effective June 28, 2013 to June 28, 2014, and had limits of insurance of $5 million per occurrence. (A certified copy of the Policy is attached as Ex. 1.) A copy of the Policy was delivered to Laxmiji's owners, Bharat Patel and Jagruti Patel (the "Patels"), in Tennessee. (*Id*. ¶ 30; B. Patel Dep.)[1]

Laxmiji worked with its retail agent, Madison Insurance Group ("MIG"), to obtain its policies. (*Id*. ¶ 30.) While MIG had an agency relationship with St. Paul, it was not acting pursuant to that relationship in obtaining the Policy because the agency contract did not apply to the Program. (Aff. of A. Korn ¶ 8, attached as Ex. 2.) MIG could not solicit an application for the Program through St. Paul, and so it utilized a wholesale broker, Appalachian Underwriters, Inc. ("Appalachian"), to obtain a quote from McGowan Program Administrators ("McGowan"), the Program's administrator. (*Id*. ¶¶ 4, 6-7, 9.) McGowan's agency agreement with Travelers governed the agency relationship for the Program. (*Id*. ¶ 5; McGowan Agmt., attached as Ex. 3.) As St. Paul's agent as limited by its agreement with St. Paul, McGowan underwrote, bound, and issued the Policy to Laxmiji. (*Id*. ¶¶ 5, 10.) The Policy identifies McGowan as the Agent and the Appalachian as the Producer. (Policy, Bates SP-FRITZ000030 & SP-FRITZ000039.) MIG is not identified in the Evidence of Insurance or Policy as a producer or agent. (*Id.*)

The Policy is an "excess" policy, such that there was no coverage until the underlying policy (Liberty's here) was exhausted:

A. We will pay on behalf of:

---

[1] St. Paul will supplement with the deposition transcript of Mr. Patel as soon as it is available.

1. the Insured all sums **in excess** of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law…

(Policy, ¶ I.A.1, Bates SP-FRITZ000045) (emphasis added). St. Paul had no duty to defend until the Liberty policy's limits were exhausted nor a duty if there was no coverage:

A. We shall have the right and duty to assume control of the defense of any Claim or Suit seeking damages covered by this policy . . . when the Retained Limit has been exhausted by payment of judgments or settlements that would be covered by this policy. . .

B. Prior to the exhaustion of the Retained Limit we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any Claim or Suit seeking damages that would be covered by this policy. . .

C. We have no duty to defend, investigate or settle any Claim or Suit seeking damages not covered by this policy.

(Policy, ¶¶ II.A-C, Bates SP-FRITZ000047.) "Retained Limit", as it pertains here, is "the total of the applicable limits of all Scheduled Underlying Insurance . . . for Bodily Injury . . . covered by such Scheduled Underlying Insurance." (Policy, ¶ I.B.1, Bates SP-FRITZ000045.) In this case, that would be the Liberty policy limit of $1 million.

The Policy contains certain exclusions which limit coverage, including one for pollution:

S. Pollution
1. Bodily Injury, Property Damage or Personal Injury or Advertising Injury arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants anywhere in the world.

(Policy, ¶ V.S.1, Bates SP-FRITZ000059.) "Pollutant" is defined in the policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and Waste." (Policy, ¶ IV.S, Bates SP-FRITZ000053.)

In the event of an occurrence that is likely to result in damages covered by the Policy, Laxmiji is required under the Policy to send notice to a specific address:

When an Occurrence happens or is committed that will likely result in damages that are covered by this policy, you or any Insured covered under this policy are required to report the claim to:
The Travelers Companies, Inc.

Attn: Excess Claims
One Tower Square, Mail Code 0000-MS07A
Hartford, CT 06183

(Policy, Bates SP-FRITZ000043.) The Policy further required Laxmiji to notify St. Paul of the

Underlying Lawsuit and cooperate with St. Paul under the "Cooperation" clause:

> F. Duties in the Event of an Occurrence, Claim or Suit
>   1. You must see to it that we are notified as soon as practicable of an Occurrence which may result in a Claim or Suit seeking damages covered by this policy…
>   2. If a Claim is made or Suit is brought against any Insured that is reasonably likely to involve the coverage provided by this policy, you must notify us in writing as soon as practicable. You and any other involved Insured also must:
>       a. immediately send us copies of any demands, notices, summonses or legal papers received in connection with the Claim or Suit…

(Policy, ¶ VII.F.1&2, Bates SP-FRITZ000063.)

The Policy's Conditions section includes several relevant provisions as well. There is a

"Voluntary Payments" clause that requires St. Paul's consent for Laxmiji to assume obligations:

> F. Duties in the Event of an Occurrence, Claim or Suit
> …
>   3. No Insured will, except at the Insured's own expense, voluntarily make a payment, assume any obligation, make any admission, or incur any expense, other than for first aid for Bodily Injury covered by this policy, **without our consent**.

(Policy, ¶ VII.F.3, Bates SP-FRITZ000063) (emphasis added). A "No Action" provision

similarly required St. Paul's consent to amounts owed or that amounts be determined at trial:

> J. Legal Action Against Us
> No person or organization has a right under this policy to sue us, join us as a party, or otherwise bring us into a Suit seeking damages from, or to determine, the liability of, any Insured unless:
>   1. you have, and any other involved Insured has, complied with all the terms of this policy; and
>   2. the amount you owe has been determined with our consent or by actual trial and final judgment.

(Policy, ¶ VII.J, Bates SP-FRITZ000062.)

Finally, the Policy can only be amended by St. Paul in accordance with the following:

> E. Changes
>
> Notice to any agent or knowledge possessed by any agent or any other person will not effect a waiver of, or a change in, any part of this policy. This policy can only be changed by a written endorsement that becomes a part of this policy and that is signed by one of our authorized representatives.

(Policy, ¶ VII.E, Bates SP-FRITZ000063.)

### *The Carbon Monoxide Incident and Underlying Lawsuit*

During the term of the Policy, on February 15, 2014, the Fritzes suffered injuries as a result of alleged carbon monoxide poisoning during their stay at the Hotel, for which they now seek to recover damages from St. Paul. (2d Am. Compl. ¶¶ 2, 19; Pl.'s Resp. to Def.'s Req. Admis. Nos. 3 & 17, attached as Ex. 4.) They initially filed a lawsuit on December 23, 2014, in the Circuit Court for Sevier County, Tennessee, against Laxmiji and the Patels (the "Underlying Lawsuit"). (Compl., *Fritz v. Laxmiji, LLC, et al.*, 14-CV-807-I ("Underlying Complaint"), attached as Ex. 5.) In the Underlying Complaint, the Fritzes sought $20 million in damages resulting from the carbon monoxide poisoning. (Underlying Compl. ¶¶ 1, 55.) They described carbon monoxide as a "gas" that causes "harmful, serious and permanent health deficits" because it deprives vital organs of oxygen. (*Id.* ¶ 2.) The Fritzes alleged they experienced chest pain and arm numbness, among other symptoms, as a result of exposure to dangerously high levels of carbon monoxide. (*Id.* ¶¶ 24, 37.) The cause of the carbon monoxide poisoning, as set out in the Underlying Complaint, was a malfunctioning pool furnace in the Hotel's basement, which caused carbon monoxide "fumes" to "permeate" the Hotel due to improper venting. (*Id.* ¶ 39.)

Shortly after their stay at the Hotel, the Fritzes' attorney sent a March 11, 2014 letter to Laxmiji notifying it of the claim, which Mr. Patel forwarded to MIG. (Letter from S. Gilreath to Laxmiji and Email from D. Giles to ProPoint, at Ex. 3 to Ammons Dep., Feb. 21, 2018, attached as Ex. 6.) MIG forwarded the letter to ProPoint Claims Services, LLC ("ProPoint"), which was

Liberty's claims administrator. (Email from D. Giles, at Ex. 3 to Ammons Dep.; 2d Am. Compl. ¶¶ 24-25.) On May 27, 2014, ProPoint denied coverage *on behalf of Liberty* because the claim was not covered due to the policy's pollution exclusion. (Letter from ProPoint to B. Patel, attached as Ex. 7.)

After the Underlying Lawsuit was filed, the Patels and Laxmiji's attorney sent notice to MIG by letters dated January 14 and January 23, 2015. (Letters from J. Murrell to J. Ammons, attached as Ex. 8.) In response, ProPoint sent a second letter declining coverage *on behalf of Liberty*. (Letter from ProPoint to Patels, attached as Ex. 9.) In this case, the Fritzes have not produced or identified any letters or other written notice that was sent directly to the Travelers' Companies address set forth in the Policy, and instead take the position that the notice to MIG was somehow sufficient. (2d Am. Compl. ¶¶ 30, 33; Pl.'s Resp. to Def.'s Interrog. No. 7, attached as Ex. 10.) As described above however, MIG was not St. Paul's agent for the Program, and in any event, was not authorized to accept notice of the claim or lawsuit; it is also undisputed that MIG never forwarded the correspondence or notice to St. Paul. (Policy, Bates SP-FRITZ000043; Ammons Dep. 15:13-16:8.) Because St. Paul did not have knowledge of the claim or Underlying Lawsuit, it never denied a defense or coverage to Laxmiji before this instant lawsuit was filed, a fact the Fritzes cannot refute with any admissible evidence. (*See* Pl.'s Supp. Resp. to Def.'s Interr. No. 8, attached as Ex. 11.)

On October 16, 2015, the court granted the Fritzes' Motion for Default Judgment in the Underlying Lawsuit. (2d Am. Compl. ¶ 39.) Thereafter, a writ of inquiry hearing on the issue of damages was held. (*Id.* ¶ 40.) Only the Fritzes appeared; Laxmiji and the Patels did not appear at the hearing, and none of the witnesses were cross-examined. (*Id.* ¶ 40; Pl.'s Resp. to Def.'s Req.

Admis. No. 11.) After hearing the testimony of the Fritzes and their expert witness, the court

entered a Judgment for Damages for $20 million as follows:

> $26,147.20 past medicals for Jessica Fritz
> $25,990.84 past medicals for Travis Fritz
> $5,491,379 future medical and life care for Jessica Fritz
> $732,834 future loss of earnings for Jessica Fritz
> $28,066 past loss of earnings for Jessica Fritz
> $6,847,791.48 pain and suffering for Jessica Fritz
> $6,847,791.48 pain and suffering for Travis Fritz

(J. Damages, attached as Ex. 12.) These amounts were awarded notwithstanding the Tennessee

statutory caps on noneconomic damages of $750,000. *See* Tenn. Code Ann. § 29-39-102(a)(2).

On May 5, 2016, after learning of the default judgment, the Patels and Laxmiji's attorney

notified the Fritzes' attorney they intended to file a motion to set aside the judgment. (Letter

from J. Murrell to S. Gilreath, attached as Ex. 13.) They filed that motion on June 24, 2016,

attaching affidavits that they were never served with notice of the default judgment motion,

hearing, or writ of inquiry hearing. (Mot. Set Aside, attached as Ex. 14.) After the motion was

filed, the Fritzes and Patels entered into a Release and Settlement, whereby the Fritzes agreed to

dismiss the claims against the Patels and release them individually of liability, in exchange for

the entry of a consent judgment against Laxmiji. (Release, attached as Ex. 15; 2d Am. Compl. ¶

45.) They also agreed to an Assignment of Claim to Benefits, in which the Fritzes agreed to not

execute against Laxmiji in exchange for the assignment of its rights under both insurance

policies. (Assignment, attached as Ex. 15; 2d Am. Compl. ¶ 47.)

On September 15, 2016, Mr. Patel sent a letter to ProPoint, Liberty's claims servicer, as

notice of his intent to confess judgment; no notice was sent to St. Paul or even to MIG, however,

a fact Mr. Patel confirmed through testimony. (Letter from B. Patel to B. Levine, attached as Ex.

16.) In response, Liberty sent a third declination letter on September 22, 2016. (Letter from

Liberty to J. Murrell, attached as Ex. 17.) On November 28, 2016, the Default Judgment and Judgment for Damages were set aside, and a $20 million consent judgment was entered in the Underlying Lawsuit (the "Consent Judgment"). (Order, attached as Ex. 17; Consent J., attached as Ex. 19.) The damages in the Consent Judgment were based on the categories of damages in the Judgment for Damages that was withdrawn. (2d Am. Compl. ¶ 2; Pl.'s Resp. to Def.'s Interrog. No. 17.) St. Paul was not made aware of, and certainly did not consent to, the settlement or Consent Judgment, facts which the Fritzes have not provided any evidence to rebut. (Pl.'s Resp. to Def.'s Req. Admis. No. 13.)

## LAW AND ANALYSIS

### I.      Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the burden of conclusively showing that no genuine issues of material fact exist in the case. *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). A fact is "material" if it might affect the outcome under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue related to a material fact is "genuine" if a reasonable jury could find in favor of the non-moving party as to that fact. *Id*. at 257.

In response to a summary judgment motion, the nonmoving party must go beyond the pleadings and present "significant probative evidence" to establish that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. In determining

whether a genuine issue of material fact exists, the court must take the strongest legitimate view

of the evidence in favor of the nonmoving party and allow all reasonable inferences in favor of

that party. *Id*. at 255. However, to defeat a motion for summary judgment, "[t]he mere existence

of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must

be evidence on which the jury could reasonably find for the [nonmovant]." *Id*. at 252.

## II.      Applicable Law

When a federal court exercises diversity jurisdiction, it must apply the forum state's

choice of law rules. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). If an insurance policy does

not contain an enforceable choice of law clause, Tennessee courts apply the substantive law of

the state in which the policy was issued and delivered. *Stand. Fire Ins. Co. v. Chester-O'Donley

& Assocs.,* 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998) (applying law of state in which insured

purchased policy and the policy was delivered). Here, the Policy does not contain a choice of law

provision, but it was issued and delivered to Laxmiji in Tennessee (as testified to by Mr. Patel),

so Tennessee's law should apply.

Under Tennessee law, questions involving coverage and duty to defend under insurance

policies "require interpretation of the insurance policy in light of claims asserted against the

insured." *Stand. Fire Ins.*, 972 S.W.2d at 6 (citations omitted). The interpretation of written

contracts involve legal issues, thus, issues regarding the scope of coverage and duty to defend

under an insurance policy present questions of law. *Id*. If relevant facts are not in dispute, such

legal questions can be resolved through a summary judgment motion. *Id*.

## III.      This Court should grant summary judgment in favor of St. Paul.

The Fritzes, as alleged third-party assignees of the Policy, seek damages from St. Paul

based on one cause of action, breach of contract. They allege St. Paul materially breached the

Policy by not providing coverage, and St. Paul failed to satisfy its obligations under the Policy, including failing to defend and to indemnify Laxmiji. (*See* 2d Am. Compl., Count II, ¶¶ 58-66.)

To prevail on a breach of contract claim, a plaintiff must prove (1) the existence of an enforceable contact, (2) nonperformance that amounts to a material breach, and (3) damages that were caused by the breach. *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). Under Tennessee law, in the event of a valid assignment, "[a]n assignee steps into the shoes of the assignor and takes his assignment subject to the defenses asserted against the assignor." *Aetna Casualty & Sur. Co. v. Tenn. Farmers Mut. Ins. Co.*, 867 S.W.2d 321, 323 (Tenn. Ct. App. 1993).

An insurance policy is a contract and the rules of construction and enforcement for contracts generally are used for insurance policies. *Blue Diamond Cole Co. v. Holland-Am. Ins. Co.*, 671 S.W.2d 829 (Tenn. 1994); *Stand. Fire Ins.*, 972 S.W.2d at 7. "[T]he primary rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Clark v. Sputniks*, 368 S.W.3d 431, 441 (Tenn. 2012). Thus, insurance policies should be interpreted as written in the absence of fraud or mistake, and the "terms should be given their natural and ordinary meaning." *Id*. (citations omitted); *see also Stand. Fire Ins.*, 972 S.W.2d at 7; *Moss v. Golden Rule Life Ins. Co.*, 724 S.W.2d 367 (Tenn. Ct. App. 1986). An insurance policy should be construed "as a whole in a reasonable and logical manner." *Clark*, 368 S.W.3d at 441 (citations omitted). Where a policy's provisions are clear and unambiguous, a court should construe it as written and should not favor either party. *Marlin & Edmondson, P.C. v. Nat'l Union Fire Ins. Co.,* 2005 Tenn. App. LEXIS 811, at *16 (Tenn. Ct. App. Dec. 22, 2005); *Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 20 (Tenn. Ct. App. 2002).

An insurer has two primary duties under a policy, a duty to defend and a duty to indemnify. The duty to defend is broader than the duty to indemnify the insured, as the duty to defend is based on the facts as alleged in the underlying complaint against the insured. *Travelers Indem. Co. of Am. v. Moore & Assocs.*, 216 S.W.3d 302, 305 (Tenn. 2007). The duty to indemnify, however, is based on the actual facts as found by the trier of fact. *Id.*

St. Paul is entitled to summary judgment on the breach of contract claim as St. Paul had no obligation to defend or indemnify Laxmiji because Laxmiji failed to comply with its duties under the Policy and voluntarily entered into the Consent Judgment in violation of the Policy and without notice to St. Paul. Further, the Policy excludes claims for injuries resulting from pollution. Moreover, the Consent Judgment on which the Fritzes seek to recover, and which St. Paul was not aware of or party to, is not binding on St. Paul and is invalid as a matter of law.

**A. St. Paul had no duty under the Policy because the Insured did not comply with the Policy' notice requirements.**

The attempt in this case to hold St. Paul liable for $20 million in damages, when St. Paul was not notified of the claim or Underlying Lawsuit and therefore had no opportunity to provide a defense or coverage, is patently unfair and contrary to the law. In the absence of providing notice pursuant to the terms of the Policy, Laxmiji was in breach of the Policy and St. Paul was under no obligation to Laxmiji. Therefore, St. Paul is not liable to the alleged third-party assignees of the Policy.

Notice provisions in insurance policies are valid conditions precedent for coverage. *Fisher v. Mut. of Omaha Ins. Co.*, 503 S.W.2d 191, 193 (Tenn. 1973); *Tenn. Farmers Mut. Ins. Co. v. Nee*, 643 S.W.2d 673, 675 (Tenn. Ct. App. 1982). If notice is not provided as required, there is no coverage for the claim. *Tenn. Farmers*, 643 S.W.2d at 675.

Here, the Policy's language is clear and straightforward—written notice must be provided to a specific address of the Travelers Companies. Laxmiji did not send notice of the carbon monoxide occurrence to the required address, a fact that cannot be genuinely disputed. Laxmiji then later compounded its breach by failing to provide notice of the Underlying Lawsuit to St. Paul as required by the Policy. Thus, as a matter of law there is no coverage for the Fritzes' claims because Laxmiji was in breach of the Policy by failing to comply with the notice requirements, and summary judgment should be granted in favor of St. Paul.

Notwithstanding the unambiguous notice language and that Laxmiji did not send notice per the Policy's terms, St. Paul anticipates the Fritzes will argue that Laxmiji provided notice to MIG, so St. Paul should be deemed to have received notice as a matter of law. In support of this position, the Fritzes will likely cite to Tenn. Code Ann. § 56-6-115(b), which states "[a]n insurance producer who solicits or negotiates an application for insurance shall be regarded, in any controversy arising from . . . any policy issued in connection with the application" as the insurer's agent. That argument should be disregarded for the following reasons.

> 1. *MIG was not St. Paul's agent.*

MIG was not acting as an agent or a producer of St. Paul for this Policy. In fact, MIG's agency contract did not apply to the Program at all. Instead, the agent for the Program is McGowan. Because of the lack of an agency relationship for this Program, MIG was unable to access the Program. Appalachian was utilized to obtain the Policy through McGowan.

Nor was MIG acting under any apparent authority. Apparent authority is determined by the acts of the principal, not the purported agent. *Star Transp., Inc. v. CSIR Enters.*, 409 F. Supp. 2d 939, 949 (W.D. Tenn. 2006). "[A] principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent

with the appearance of authority, and not where the agent's own conduct has created the apparent authority." *Id*. (citations omitted).

St. Paul did nothing to provide MIG with the appearance that it had authority to accept notice of claims nor did it represent to Laxmiji that MIG had authority on its behalf. To the contrary, St. Paul identified Appalachian as the "producer" on the Evidence of Insurance and McGowan as the agent, not MIG. Moreover, the Policy had no language allowing notice to an agent in lieu of the specific Travelers Companies address. Thus, as a matter of law, notice to MIG should not be construed as notice to St. Paul.

### 2. Notice to MIG did not comply with the Policy's requirements.

Tennessee law is clear that an insured is charged with knowledge of the policy's terms, and neither the insured nor an agent are authorized to change the terms if the policy prevents such altering. In *Finchum v. Patterson*, the lower court had entered a judgment in favor of the policyholder because the agent represented to the policyholder that a loss was covered, despite the policy's language excluding the coverage. 2008 Tenn. App. LEXIS 279, at *12-14 (Tenn. Ct. App. May 9, 2008). On appeal, the Court of Appeals reversed the lower court because the agent had no authority to alter the terms of the policy where the policy contained a provision that only the insurer had the authority to alter or amend the terms. *Id.* at *21. The court held the insured was charged with knowledge of the policy's provision on altering the terms, even if she did not read the policy. *Id*. As such, the policyholder had clear notice of the agent's lack of authority and could not rely on the agent's representations that the loss was covered. *Id.*; *see also Wilson v. State Farm Fire & Cas. Co.*, 799 F. Supp. 2d 829, 835 (E.D. Tenn. 2011) (holding the policy holder is presumed to have knowledge of the policy's terms and is bound by those terms).

Similarly, in *Builders Mutual Insurance Co. v. Pickens*, the insured argued that the agent's representations altered the policy's terms. 2013 U.S. Dist. LEXIS 101410, at *7 (E.D.

Tenn. July 18, 2013). The plaintiff relied on caselaw that held an agent could waive provisions of a policy. *Id*. The court found the reliance to be misplaced, however, because that applies only if the insured has no knowledge that the agent lacks authority to alter the terms. *Id*. Because the policy contained a provision that only the insurer could alter the terms of the policy, the insured was charged with knowledge that the agent lacked authority to alter the terms. *Id*. at *8. As such, the insured's estoppel argument failed as a matter of law. *Id*.

Here, the Policy was clear about where notice must be sent. It contained no language allowing any exception, including any exception that would allow for notice to be provided to an agent in lieu of direct notice to St. Paul at the indicated address. Laxmiji knew that notice must be provided to that specific address, as it received a copy of the Policy and as a matter of law, Laxmiji is charged with knowledge of the Policy's terms.[2]

Moreover, Laxmiji knew that the Policy did not authorize either Laxmiji or MIG to change the notice requirements in the Policy. Only St. Paul could change it through a signed written endorsement, and there is no evidence that the Fritzes could present of a valid written endorsement that would allow Laxmiji to provide notice to an agent in lieu of the specific address set out in the Policy. Thus, any purported notice to MIG did not comply with the terms of the Policy and failed to satisfy the condition precedent of notice.

Laxmiji was bound by the notice provision as written in the Policy, and providing notice to MIG did not satisfy the Policy's unambiguous notice requirements. Because Laxmiji did not comply with the notice provision, St. Paul's obligations under the Policy were not triggered. Accordingly, St. Paul is entitled to judgment as a matter of law on the breach of contract claim.

---

[2] The Fritzes also received a copy of the Policy prior to filing the Underlying Lawsuit and were aware of the terms, yet they also failed to comply with the notice requirements.

**B. The Consent Judgment is invalid and unenforceable against St. Paul.**

The Consent Judgment was not the product of "hard bargaining" between the Fritzes and Laxmiji, but rather was a means for the Patels to avoid personal liability and for the Fritzes to try to pave the way to pursue St. Paul for an extraordinarily large amount of money, an amount that is notably 4 times the limits under the Policy and contains damages that far exceed relevant statutory caps. Fortunately, Tennessee law does not condone such conduct. St. Paul is not bound by the Consent Judgment because it was not notified as required under the Policy and did not have an opportunity to decide whether to provide a defense or coverage. Further, the Consent Judgment is unenforceable against St. Paul because Laxmiji voluntary assumed liability in violation of the Voluntary Payments clause, it is an improper attempt to collect against St. Paul for an amount not determined in accordance with the No-Action clause, and was entered without St. Paul's consent in violation of the Cooperation clause.

*1. St. Paul is not bound by the Consent Judgment as a matter of law.*

St. Paul is not bound by the Consent Judgment because it did know of the Underlying Lawsuit, did not have a duty to defend, and did not make a decision on whether to defend. Under Tennessee law, an insurer is only bound by a prior judgment if the insurer had the duty to defend, received timely notice of the underlying lawsuit, and either elected to defend or not to defend. *Kelly v. Cherokee Ins. Co.*, 574 S.W.2d 735, 737 (Tenn. 1978). Moreover, in such a case, the insurer is only bound as to the issues that were litigated for that prior judgment. *Id.* While a prior judgment may establish liability on the insured's part, it does not create coverage where none exists under the policy. *See id.* at 738 ("[T]he binding effect of a judgment against the insured does not extend to matters outside the scope of the insurance contract, and the [insurer] is neither obligated to defend nor bound by the findings of the court if the claim against the insured is not covered by the policy.") (citations omitted).

In *Clark v. Sputnick*, the Tennessee Supreme Court was presented with the issue of whether an insurer could argue there was no coverage after a default judgment had been entered against the insured. 368 S.W.3d at 437. The *Clark* court reiterated the general rule that the binding effect of an earlier judgment presumes there was a duty to defend. *Id*. Applying its prior reasoning in *Kelly*, and accepting the allegations in the underlying complaint to be true, it found that the prior default judgment would not bind the insurer because the incident was not covered by the policy. *Id*. Moreover, the insurer was not estopped from arguing lack of coverage because the issue was not raised in the pleadings or decided by the default judgment. *Id*. at 439.

Here, the Consent Judgment is not binding on St. Paul because it had no duty to defend. The Policy provides that St. Paul's duty to defend only arises "when the Retained Limit [of Liberty's underlying policy] has been exhausted." (Policy, SP-FRITZ000047.) It is undisputed that Liberty declined to defend Laxmiji. Thus, the Retained Limit was not exhausted in the Underlying Lawsuit, and St. Paul had no duty to defend. Further, there is no duty to defend a "Claim or Suit seeking damages not covered by this policy." (Policy, SP-FRITZ000047.) The Fritzes' damages were not covered by the Policy because the claim for carbon monoxide poisoning was excluded by the Policy's pollution exclusion, as discussed below.

The Consent Judgment is also not binding on St. Paul because it did not receive timely notice of the claim and as a result, St. Paul could not elect to defend or to not defend. The Fritzes have not provided any evidence that notice was provided to St. Paul in the manner as required by the terms of the Policy, which, as discussed above, relieved St. Paul of any duty to defend.

St. Paul did not have a duty to defend, did not receive timely notice of the claim, and never declined to defend during the pendency of the Underlying Lawsuit. As such, as a matter of law, St. Paul is not bound by the Consent Judgment.

### 2. *The Consent Judgment is unenforceable because it violates the Policy.*

The Consent Judgment is also unenforceable against St. Paul because it was entered into in violation of the Policy. The Policy contains a Voluntary Payments clause, which prohibited Laxmiji from voluntarily assuming any obligation without St. Paul's consent. (Policy, SP-FRITZ000063.) The Policy also contains a No Action clause, which prohibits any action against St. Paul if the amount owed by Laxmiji was not consented to by St. Paul or determined at an actual trial and final judgment. (Policy, SP-FRITZ000062.) Of course, Laxmiji was also required to notify St. Paul of this development in the Underlying Lawsuit pursuant to the Cooperation clause. (Policy, SP-FRITZ000063.) Laxmiji violated all of these by agreeing to the Consent Judgment without providing notice to or obtaining consent from St. Paul.

Provisions such as these are valid and binding conditions precedent, a breach of which by the insured provides the insurer with a defense to liability in the absence of waiver or estoppel. *Goodner v. Occidental Fire & Cas. Co.,* 440 S.W.2d 614, 616 (Tenn. 1968) (recognizing the validity of the cooperation clause and no action clause in the policy at issue); *Kosloff v. State Auto. Mut. Ins. Co.*, 1989 Tenn. App. LEXIS 788, at *9-10 (Tenn. Ct. App. Dec. 1, 1989) (holding that no action clauses are enforceable). The purpose of upholding condition precedents such as these is to protect insurers from collusive efforts between the insured and an injured party. *See Linehan v. Allstate Ins. Co.*, 1994 Tenn. App. LEXIS 27, at *12 (Tenn. Ct. App. May 4, 1994). The breach of conditions precedent is also a defense as to an injured party, whose rights "can rise no higher than" those of the insured. *See Hartford Acc. & Indem. Co. v. Partridge*, 192 S.W.2d 701, 702-03 (Tenn. 1946) (citations omitted); *see also Goodner,* 440 S.W.2d at 616 (quoting prior holdings that condition precedents are "valid and binding upon both the insured and the [judgment creditor], whose rights are derivative, rising no higher than those of the named insured under the policy").

Here, the Consent Judgment was made between the Fritzes and St. Paul's insured, without St. Paul's knowledge or consent, in violation of several provisions of the Policy. First, it cannot be disputed that Laxmiji and the Patels voluntarily agreed to the entry of the Consent Judgment without St. Paul's consent, which violates the Voluntary Payments clause requiring St. Paul's consent to assume an obligation. Because St. Paul was not asked to consent to the Consent Judgment, it logically follows that St. Paul had no opportunity to provide consent.

Second, the Consent Judgment is unenforceable against St. Paul because the Fritzes' efforts to collect on it through this lawsuit violate the No-Action clause. Without consent or an actual trial, no action can be had against St. Paul. St. Paul did not consent to the amount owed by Laxmiji, nor was there an actual trial that determined the amount. A writ of inquiry hearing on damages for a default judgment is hardly "an actual trial"; in fact, it is undisputed that the writ of inquiry hearing was one-sided, with only the Fritzes present. There was no cross-examination of any witnesses and no real adversarial proceeding to meet the requirements of the Policy.

Third, the Consent Judgment violates the Cooperation clause because no notice of it was provided to St. Paul. Mr. Patel sent a letter directly to Liberty's claims service notifying it of their intent to confess judgment, but that letter and Mr. Patel's testimony are evidence that he did not notify St. Paul (or even MIG) of the intent to agree to a $20 million judgment.

The Policy's conditions precedent protect St. Paul from collusive efforts between its insured and others. As a result of the violations of those provisions, the Fritzes (who are entitled to no more rights than Laxmiji), cannot enforce the Consent Judgment against St. Paul.

3. *The Consent Judgment violates Tennessee law.*

The amount of the damages in the Consent Judgment exceeds statutory caps and thus should be found to be invalid as a matter of law. Tennessee law limits the amount of noneconomic damages a plaintiff can be awarded as follows:

(a) In a civil action, each injured plaintiff may be awarded:

…

(2) Compensation for any noneconomic damages suffered by each injured plaintiff not to exceed seven hundred fifty thousand dollars ($750,000) for all injuries and occurrences that were or could have been asserted, regardless of whether the action is based on a single act or omission or a series of acts or omissions that allegedly caused the injuries or death.

Tenn. Code Ann. § 29-39-102(a)(2). Noneconomic damages include damages for pain and suffering and loss of consortium. *See* Tenn. Code Ann. § 29-39-102(e).

The Consent Judgment completely disregards and attempts to circumvent the statutory cap on damages. The Judgment for Damages in the Underlying Lawsuit included $6,847,791.48 in pain and suffering damages for Jessica Fritz, and another $6,847,791.48 in pain and suffering damages for Travis Fritz. That judgment amount far exceeded the $750,000 cap on noneconomic damages. The damages in the Consent Judgment were based on the withdrawn Judgment for Damages, therefore, the Consent Judgment contains noneconomic damages that exceed the cap for each of the Fritzes by $6,097,791.48 each, or a combined total of $12,195,582.96 in excess of the cap. St. Paul should not be bound by the Consent Judgment as it violates Tennessee law.

**C. St. Paul did not breach the Policy because the Policy does not apply to Pollution.**

The Fritzes' claim is based on their exposure to carbon monoxide poisoning. That exposure falls under a clear and unambiguous Policy exclusion, and as such, St. Paul had no duty to its insured for which these alleged third-party assignees can recover.

Exclusions in an insurance policy "help define and shape the scope of coverage." *Stand. Fire Ins.*, 972 S.W.2d at 7. Exclusions should not "be construed so narrowly as to defeat their intended purpose." *Id*. at 8. In keeping with Tennessee rules of contract interpretation, unambiguous exclusions should be construed using their plain and ordinary meaning and applied accordingly to the facts of the case. *See, e.g., Ski Chalet Vill. Owners Club, Inc. v. Employers*

*Mut. Cas. Co,* 2016 U.S. Dist. LEXIS 161563, at \*7-9 (E.D. Tenn. Nov. 22, 2016) (analyzing a policy exclusion consistent with its "plain meaning" to find the exclusion applied).

Pollution exclusion clauses similar to the one here have been found to be unambiguous by numerous courts, including within Tennessee, and as a result are interpreted to include all types of pollution. In *CBL & Assoc. Management, Inc. v. Lumbermens Mutual Casualty Co.*, the Eastern District of Tennessee found a pollution exclusion applied to injuries caused by sewage and other waste from a plumbing problem that contaminated the premises. 2006 U.S. Dist. LEXIS 51240, at \*6 (E.D. Tenn. July 25, 2006). The Court recognized the split in authority of cases regarding the application of total pollution exclusions, the first line of cases finding pollution exclusions only apply to traditional environmental pollutants ("traditional approach"), versus a second line of cases that find the exclusions apply to all types of pollution that fall under the policy's language ("modern approach"), but the Court noted that Tennessee courts had not decided the issue. *Id.* at \*21-25. However, because of Tennessee's well-established contract interpretation rule that unambiguous language must be given its "plain, ordinary and popular" meaning, the Court concluded Tennessee courts "would adopt the reasoning of the second line of cases and would conclude that the pollution exclusion applies to all types of pollution [] and not just to traditional environmental pollutants" if faced with the issue. *Id.* at \*19, 24-25. The Court reasoned the modern approach is based on the ordinary meaning of the exclusion, and thus, the first line of cases is not in accord with Tennessee rules of contract interpretation. *Id.* at \*25-26.

Using the Tennessee rules of contract interpretation, the *CBL* Court analyzed the exclusion.[3] *Id.* at \*8. The court looked to the definition of "pollutant" in the policies at issue,

---

[3]  The exclusion was for bodily injury "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants . . ." *Id.*

which was defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id*. at *19-20. Because "irritant" and "contaminant" were not further defined, the court noted it was permissible to refer to dictionary definitions to determine the "plain, ordinary and popular" meaning. *Id*. at *19. The Court then found the exclusion's language was unambiguous and it applied to the sewage and other materials. *Id*. at *20-21, 27.

Other courts in Tennessee have likewise found that similar pollution exclusions were unambiguous and should be applied in accordance with their plain meaning. In *Sulphuric Acid Trading Co. v. Greenwich Ins. Co.,* a transfer of sulphuric acid was taking place when a coupling on the rail car broke, spewing 1,800 gallons of sulphuric acid into the air and injuring an employee. 211 S.W.3d 243, 245 (Tenn. Ct. App. 2006). The insurer denied coverage because of the pollution exclusion, which applied to bodily injury "which would not have occurred in whole or in part but for the actual, alleged, possible, or threatened, intentional or unintentional, discharge, disposal, dispersal, seepage, migration, release or escape of pollutants." *Id.* at 245-46. "Pollutants" was defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste." *Id.* at 246. The lower court had found that the language was unambiguous and applied to the facts because the incident occurred from a discharge, release or escape of a pollutant, which was defined to include an acid. *Id*. In rejecting an argument that sulphuric acid was not an acid within the policy's definition, the lower court noted that it was "precluded from creating an ambiguity in an insurance contract where none exists and giving to words meanings other than those ordinarily understood." *Id.* at 246-47. On appeal, the court discussed the split of authority and the lack of a Tennessee decision on the issue, but declined to decide which line of cases Tennessee

would follow because the pollution exclusion at issue was unambiguous and applied to the injuries caused by sulphuric acid. *Id*. at 253-54. Similarly, the Western District of Tennessee applied Tennessee law in determining a pollution exclusion applied to gasoline leaks from an underground storage tank, demonstrating that the court was utilizing the modern approach that applies the plain language of the pollution exclusion to the facts. *Certain Underwriters at Lloyd's, London v. Alkabsh*, 2011 U.S. Dist. LEXIS 26593, at *25 (W.D. Tenn. Mar. 15, 2011).

Other jurisdictions using the same rules of contract interpretation as Tennessee have likewise applied the exclusion to all types of pollution to the extent they are covered by the exclusion's plain language. One such case in Ohio, *Owners Insurance Co. v. Singh*, used rules of contract interpretation to find that the pollution exclusion[4] there applied to carbon monoxide poisoning resulting from a defective gas furnace in an apartment. 1999 Ohio App. LEXIS 4734, at *7-9 (Ohio Ct. App. Sept. 21, 1999). In another Ohio case, the Sixth Circuit rejected the argument that pollution exclusions only apply to traditional environmental pollutants, referring to numerous cases from other jurisdictions that have examined the plain language of pollution exclusions and concluded that they were unambiguous and apply outside of the context of traditional environmental pollutants. *Longaberger Co. v. U.S. Fid. & Guar. Co.*, 1999 U.S. App. LEXIS 34462, at *3-5, 7 (6th Cir. Dec. 15, 1999) (upholding the district court's ruling that the release of carbon monoxide fumes from a defective furnace was excluded under the pollution exclusion's plain language)[5]; *see also Foremost Ins. Co. v. Nosam*, 2018 U.S. Dist. LEXIS

---

[4] The language excluded coverage for personal or bodily injury "arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at or from premises you own," and pollutants was defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id*. at *6.

[5] The exclusion's language provided that coverage did not apply to "bodily injury or property damage arising out of the actual, alleged, threatened discharge, dispersal, seepage, migration,

189251, at *12-13 (E.D. Pa. Nov. 5, 2018) (finding carbon monoxide poisoning was excluded under the unambiguous language of the pollution exclusion).

The rationale of these cases, all of which involve jurisdictions that use the plain language doctrine of contract interpretation, should control here. Those cases each had pollution exclusions that were similar to the one at issue here and the courts found them to be clear and unambiguous. The exclusion in the Policy here should likewise be found to be unambiguous and given effect as written to the facts here.

The undisputed facts demonstrate that the Fritzes' claims fall squarely within the plain language of this unambiguous exclusion. The Fritzes specifically seek to recover for alleged damages resulting from bodily injuries they suffered as a result of carbon monoxide poisoning during their stay at the Hotel. The Policy contains an exclusion for pollution, so that there is no coverage for bodily injuries arising out of "discharge, dispersal, seepage, migration, release or escape of Pollutants anywhere in the world." (Policy, SP-FRITZ000059.) As they alleged in the Underlying Lawsuit, the carbon monoxide was emitted from the gas furnace in the basement, and due to improper ventilation, carbon monoxide fumes "permeated" the Hotel. Applying those facts to the plain language of the exclusion, the carbon monoxide release is an event as described in the exclusion.

Further, just as in the similar definitions in other cases, here there is no ambiguity to the definition of pollutant. The plain language defines it to include "any solid, liquid, **gaseous** or thermal **irritant or contaminan**t, including smoke, vapors, soot, **fumes**, acids, alkalis, chemicals and Waste." (Policy at SP-FRITZ000053) (emphasis added.) In the Underlying Complaint, the

---

release or escape of pollutants," and pollutants was defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id*. at *2-3.

Fritzes used some of those exact terms by alleging carbon monoxide is a "gas," and also alleging that the carbon monoxide-laden "fumes" poisoned them. Giving the word "contaminant" its ordinary meaning, their allegations that the indoor air quality contained dangerously high levels of "poisonous" carbon monoxide certainly would qualify carbon monoxide as a contaminant. Moreover, they alleged they experienced chest pains and arm numbness as a result of the carbon monoxide exposure. Considering an ordinary meaning of "irritant," carbon monoxide's effect on the Fritzes in causing chest pains and arm numbness, among other symptoms, would qualify it as an irritant. Accordingly, applying those facts as alleged by the Fritzes to the plain and ordinary meaning of the terms used in the Policy, carbon monoxide is a pollutant as defined in the Policy because it is a gaseous irritant or contaminant and the fumes poisoned the Fritzes.

The Fritzes seek to recover for their alleged injuries resulting from the release of carbon monoxide fumes in the Hotel. Because carbon monoxide is a pollutant as defined in the Policy, their claims clearly falls within the Policy's pollution exclusion. Thus, as a matter of law, judgment should be made in favor of St. Paul because it was under no obligation to provide a defense or indemnify Laxmiji with respect to the Fritzes' claims.

## CONCLUSION

For the foregoing reasons, St. Paul respectfully requests that the Court grant its motion for summary judgment.

[signature block on following page]

s/ Amy Worrell Sterling
Michael G. McLaren (#5100)
Amy Worrell Sterling (#25773)
BLACK McLAREN JONES
RYLAND & GRIFFEE, P.C.
530 Oak Court Drive, Suite 360
Memphis, Tennessee 38117
901-762-0535
901-762-0539 – fax
mmclaren@blackmclaw.com
asterling@blackmclaw.com

*ATTORNEYS FOR ST. PAUL FIRE AND*
*MARINE INSURANCE COMPANY*

## CERTIFICATE OF SERVICE

A true and correct copy of the above and foregoing has been served upon all counsel of record in this cause electronically via the Court's ECF system on this the 3rd day of April, 2019.

s/ Amy Worrell Sterling