**EXHIBIT 20**

**In the Matter Of:**

*TRAVIS AND JESSICA FRITZ vs*

*ST. PAUL FIRE AND MARINE INSURANCE*

*3:17-CV-00433*

---

*BHARAT PATEL*

*April 03, 2019*

---



**We Bridge the State and Cover the Nation!**

www.alphareporting.com

800-556-8974

```
 1              VIDEOTAPED DEPOSITION OF BHARAT PATEL

 2                        April 3, 2019

 3             IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TENNESSEE

 4     ----------------------------------
 5     TRAVIS AND JESSICA FRITZ,          )
       As Third Party Beneficiaries of   )
 6     LAXMIJI, LLC, individually, and    )
       LAXMIJI, LLC, d/b/a                )
 7     MOUNTAIN VISTA INN & SUITES,       ) DOCKET NO.
       BHARAT PATEL individually, and     ) 3:17-CV-00433
 8     BHARAT PATEL d/b/a MOUNTAIN VISTA  )
       INN & SUITES, JAGRUTI PATEL,       )
 9                                        )
                Plaintiffs,               )
10                                        )
       vs.                                )
11                                        )
       ST. PAUL FIRE AND MARINE INSURANCE )
12     COMPANY,                           )
                                          )
13              Defendant.                )
       ----------------------------------
14

15

16     APPEARANCES:

17             FOR THE PLAINTIFFS TRAVIS AND JESSICA
               FRITZ:
18
               SIDNEY GILREATH, ESQ.
19             Gilreath & Associates, PLLC
               550 Main Street, Suite 600
20             Knoxville, Tennessee  37902

21             FOR THE PLAINTIFFS LAXMIJI and PATEL:

22             JEFFREY R. MURRELL, ESQ.
               Johnson, Murrell & Associates
23             150 Court Avenue
               Sevierville, Tennessee  37862

24

25
```

**2**

```
1  APPEARANCES:  (Continued)
2              FOR THE DEFENDANT ST. PAUL:
3              MICHAEL G. MCLAREN, ESQ.
               Black McLaren Jones Ryland &
4              Griffee, P.C.
               530 Oak Court Drive, Suite 360
5              Memphis, Tennessee  38117
6  ALSO PRESENT:
7              Angie Poplin, Videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1              S T I P U L A T I O N S
2         The videotaped deposition of BHARAT PATEL,
3  called as a witness at the instance of the Defendant,
4  taken pursuant to all rules applicable to the Federal
5  Rules of Civil Procedure by agreement on the 3rd day of
6  April, 2019, at 8:53 a.m., at the law office of
7  Johnson, Murrell & Associates, 150 Court Avenue,
8  Sevierville, Tennessee, before Rhonda S. Sansom, RPR,
9  CRR, CRC, Licensed Court Reporter, pursuant to
10  stipulation of counsel.
11         It being agreed that Rhonda S. Sansom, RPR,
12  CRR, CRC, Licensed Court Reporter, may report the
13  deposition in machine shorthand, afterwards reducing
14  the same to typewriting.
15         All objections except as to the form of the
16  questions are reserved to on or before the hearing.
17         It being further agreed that all formalities
18  as to notice, caption, certificate, transmission, et
19  cetera, including the reading of the completed
20  deposition by the witness and the signature of the
21  witness, are expressly waived.
22
23
24
25
```

**4**

```
1              I N D E X
2         E X A M I N A T I O N S
3
4  BHARAT PATEL                              Page
5  Examination by Mr. McLaren                  6
6  Examination by Mr. Gilreath                66
7
8         E X H I B I T S
9
10  No.        Description                   Page
11  1   Amended Notice to Take the Videotaped
        Deposition of Jagruti Patel            6
12
13  2   St. Paul Fire and Marine Insurance
        Company, Certified Policy re Policy No.
        ZUP14S94937-12                          6
14
15  3   11/25/13 Letter, MIG Insurance to
        Laxmiji, re Burlington, Amtrust, and
        St. Paul Policies                      31
16
17  4   1/14/15 Letter, Murrell to Ammons/MIG,
        re Laxmiji and Patel                   40
18  5   1/23/15 Letter, Murrell to Ammons/MIG,
        re Laxmiji and Patel                   41
19
20  6   5/27/14 Letter, Propoint Claim Services
        to Bharat Patel, re Insured Laxmiji and
        Claimants Fritz                        42
21
22  7   2/3/15 Letter, Propoint Claim Services
        to Bharat Patel, re Insured Laxmiji and
        Claimants Fritz                        44
23
24  8   9/15/16 Letter/Email, Bharat Patel to
        Beth Levine, re Insured Laxmiji and
        Claimants Fritz                        45
25
```

**5**

```
1  9   9/22/16 Letter, Liberty to Murrell, re
        Insured, Laxmiji, dba Mountain Vista
2       Inn & Suites                           46
3  10  Judgment for Damages                    48
4  11  5/4/16 Letter, Murrell to Gilreath, re
        Fritz v. Laxmiji                       53
5
6  12  Motion to Set Aside Default Judgment
        and Judgment for Damages               57
7  13  Agreed Order Setting Aside Default
        Judgment and Judgment for Damages      58
8
9  14  Consent Judgment for Damages            59
10  15  11/11/16 Letter, Janet, Jenner & Suggs
        to Murrell, re Fritz, et al., v.
        Laxmiji LLC                            61
11
12
13         REQUESTED INFORMATION
14
15  Description               Page/Line
16  Information re Previous
        Lawsuits              10/25
17
        Policy Limit of Liberty
18      Policy from Declaration
        Page                  34/1
19
20
21
22
23
24
25
```

**6**

```
1              (Exhibit Nos. 1 and 2 marked.)
2              THE VIDEOGRAPHER:  We are now on the
3    record.  Today is Wednesday, April the 3rd, 2019,
4    and the time is 9:53.
5              This deposition is being taken at
6    Johnson, Murrell & Associates in Sevierville,
7    Tennessee, Case No. 3:17-CV-00433, filed in the
8    United States District Court, Eastern District of
9    Tennessee at Knoxville, in the case of Travis and
10   Jessica Fritz et al., versus St. Paul Fire and
11   Marine Insurance Company.
12             This is the video deposition of Bharat
13   Patel.
14             The court reporter will now swear in the
15   witness.
16                  BHARAT PATEL,
17   having been first duly sworn, testified as follows:
18                  EXAMINATION
19   BY MR. MCLAREN:
20        Q.    Mr. Patel, my name is Mike McLaren, and I
21   represent St. Paul and Travelers Insurance Company.
22   I'm going to be using those changes -- those names
23   interchangeably.
24             Have you ever given a deposition before?
25        A.    No, first time.
```

**7**

```
1        Q.    Okay.  Well, I'm going to be asking you
2    some questions.
3              MR. MCLAREN:  And can we lawyers have an
4        agreement that we'll reserve any objections for
5        the Judge, except those as to form in case I have
6        to correct something as I go along?
7              MR. MURRELL:  That would be fine.
8              MR. GILREATH:  Okay.
9              MR. MCLAREN:  All right.
10   BY MR. MCLAREN:
11        Q.    I'm going to be asking you some questions
12   about the incident that occurred over Valentine's Day
13   at your hotel.
14        A.    Right.
15        Q.    And if you don't understand my questions,
16   will you just let me know so I can correct them?
17        A.    Okay.
18        Q.    And if you want to take a break any time,
19   go ahead, just raise your hand and we'll take a break.
20   If I have a question pending, it would be better to
21   answer the question and then take a break.
22        A.    Right.
23        Q.    Okay?  I don't intend to be long, but I'm
24   going to be asking you questions about what happened
25   and what you did after what happened.
```

**8**

```
1        A.    Uh-huh.
2        Q.    So again, if you don't understand
3    something, let me know.  If you answer, I'll assume you
4    understood the question.  Is that okay?
5        A.    Okay, yeah, that's good.
6        Q.    Okay.  Now, you identified yourself as
7    Bert Patel.  But can you spell your first name?
8        A.    Yeah, it's Bharat Patel.  It's
9    B-H-A-R-A-T Patel.
10        Q.    Okay.  I noticed in the notice to take
11   deposition it is for Jagruti Patel, and that's
12   J-A-G-R-U-T-I.  I'm not sure if I'm pronouncing it
13   correctly.
14        A.    Yeah, that's it.  That's good, yeah.
15        Q.    But that's your wife, right?
16        A.    Yeah.
17        Q.    So instead, by agreement, we're taking
18   your deposition so we don't all have to come back here.
19   And I'm not interested in taking your wife's
20   deposition.
21        A.    Yes.
22        Q.    Okay.
23             MR. MCLAREN:  Yes?
24             MR. MORRELL:  Mr. Patel nor I were aware
25        that the deposition was noticed.  He's appearing
```

**9**

```
1        voluntarily and is not under subpoena or, to my
2        knowledge, a noticed deposition.
3              MR. MCLAREN:  I made the Notice No. 1,
4        but I just noticed it's for Jagruti, not Bert.  So
5        I guess, just by agreement, we're agreeing to go
6        forward.  Is that okay with you?
7              MR. MURRELL:  That's fine.  I don't know
8        who the notice was provided to, but it wasn't
9        provided to me.
10             MR. MCLAREN:  Gotcha.  It doesn't ask for
11        any documents or anything else.  Here is a copy --
12             MR. MURRELL:  Thank you.
13             MR. MCLAREN:  -- for your round file
14        later.
15             MR. MURRELL:  All right.  Very good.
16        Thank you.
17             MR. MCLAREN:  Yes, sir.
18   BY MR. MCLAREN:
19        Q.    Mr. Murrell is your attorney?
20        A.    Yeah.
21        Q.    Right?
22        A.    Uh-huh.
23        Q.    Mr. Gilreath is not.  He's the attorney
24   for the Fritzes, correct?
25        A.    I guess.  That's the first time I met
```

**10**

1  him, so --
2      Q.      First time you've met or seen
3  Mr. Gilreath?
4      A.      Yes, uh-huh.
5      Q.      How about Mr. Suggs?  Do you know him?
6      A.      I don't know nobody from their side.
7  I've never seen him, so -- I mean, I seen it on the
8  paper, maybe, but I never personally seen them.
9      Q.      Okay.  In this matter, Mr. Murrell is
10 your attorney?
11     A.      Yes.
12     Q.      All right.  That's good.  Okay.  Can you,
13 for one more formality, state your name and spell it?
14     A.      It's Bharat Patel.  Spelling is
15 B-H-A-R-A-T.  Last name Patel, P-A-T-E-L.
16     Q.      Okay.  Have you ever been involved in a
17 lawsuit before, before this one?
18     A.      I mean, I don't know.  I mean, we have a
19 hotel that, you know, it might happen.  But I don't
20 know right now, honestly.
21     Q.      Okay.  You don't recall being a
22 defendant, where somebody's sued you; or a plaintiff,
23 where you got sued?
24     A.      Not to my knowledge, no.  I don't know.
25     Q.      All right.  If you happen to remember

**11**

1  being sued or suing somebody, can you furnish that
2  information to your attorney so he can decide whether
3  to furnish it to me?
4      A.      Okay.
5      Q.      Okay.  What's the hotel that you own?
6  You said you own a hotel.  Do you own more than one?
7      A.      Just one.
8      Q.      Okay.  What's the name of it?
9      A.      It's Mountain Vista Inn, doing business
10 as Laxmiji, LLC, is the corporation name.
11     Q.      Okay.  Where is that from here?
12     A.      It's at 2647 Parkway, Pigeon Forge,
13 Tennessee, 37863, is the address.  It's about five
14 minutes from here.
15     Q.      Okay.  I stayed down at Governor's
16 Crossing last night.  I'm not sure why, but I did.  Is
17 it between here and Governor's Crossing?
18     A.      No, it's further past.
19     Q.      Further past Governor's Crossing?  Okay.
20     A.      About three, four miles from there.
21 Three miles or something.
22     Q.      Okay.  Do you own that hotel or does
23 Laxmiji own that hotel?
24     A.      I mean, Laxmiji is the corporation.  Me
25 and my wife is the owner of the corporation.

**12**

1      Q.      You own the corporation that owns the
2  hotel?
3      A.      Right.  That's how I guess --
4      Q.      Okay.
5      A.      -- it's listed here.
6      Q.      Okay.  What's the meaning of the name
7  Laxmiji?
8      A.      It's our region name.
9      Q.      It's a region of where?
10     A.      From India.
11     Q.      Okay.
12     A.      And we used it.  My wife liked the name,
13 so we got that name open so we took it.
14     Q.      Does Laxmiji own any other hotels?
15     A.      No, that's it.
16     Q.      How many rooms does that hotel have?
17     A.      58.  I mean, there's a couple of rooms
18 off, but 58 total rooms here.
19     Q.      With an indoor swimming pool?
20     A.      Uh-huh.
21     Q.      Okay.  I got to ask you some questions.
22 I hope the answer is "No," but I have to ask them.
23     Have you ever been arrested?
24     A.      I mean, long time ago.  I was young, 21,
25 22.  I mean, DUI.  That's about it.  That's the only

**13**

1  one time.
2      Q.      Okay.  Did you get convicted of DUI or
3  did you plead no contest or something?
4      A.      See, right now, it's about 30 years ago.
5  I'm not sure.  But probably, I mean, you know, I was
6  there.  That's it.  After that, I stopped drinking.  I
7  learned my lesson fast.
8      Q.      If only we all would.
9      A.      Yeah.
10     Q.      Have you ever been a witness in a lawsuit
11 before today?
12     A.      No.
13     Q.      Tell me a little bit about your
14 background.
15     A.      I've been -- I'm from India.  And I was
16 young, came down, came to U.S. in 1982.  Was in Bristol
17 for a long time, then moved to Pigeon Forge with a
18 friend.  Had a hotel.  We've been partners, then we
19 sold it and I got this one, the Mountain Vista.
20     Q.      What was that hotel?
21     A.      Royal Inn was the name of it, across the
22 street from there.
23     Q.      How did you find your way to Pigeon Forge
24 or Sevierville?
25     A.      My friend was here.  He owned the hotel,

**14**

1  so he emailed me that "Hey, do you want to do a
2  partnership?" and decided to do a partnership with him.
3      Q.   Okay.  As we're moving forward today and
4  I'm asking you questions, I want to make sure that
5  you're not taking any medication or doing anything --
6      A.   Yeah, I'm taking medication.
7      Q.   Okay.  Are you taking any medication that
8  could impair you answering my questions, that would
9  interfere with you?
10     A.   Well, I don't know.  I just started a new
11 medicine.  It's for anxiety.  So, you know, I mean, so
12 far I'm okay, I mean.
13     Q.   Okay.  What's the medicine?
14     A.   I don't know the names.  I cannot
15 pronounce it properly, and I am not sure.
16     Q.   Okay.
17     A.   But I just started this week.  I mean, I
18 was already on medicine, but the doctor recommended
19 this one for me, so -- and I've got a blood pressure
20 medicine, too.
21     Q.   Okay.  Amlodipine?
22     A.   No, lisinopril for the blood pressure.
23     Q.   Lisinopril?
24     A.   That's one I know.  The other one is hard
25 for me to tell you.

**15**

1      Q.   My guess is, most people at this table
2  are taking a blood pressure medication.
3      A.   Yes, with the business you are in.
4      Q.   But if you do get anxious or stressed or
5  feel like you have any problems answering questions,
6  please tell us and take a break.
7      A.   Okay.
8      Q.   And if you don't tell me, I'm going to
9  assume you're okay.
10     A.   Okay.  Yeah, I will definitely do that.
11     Q.   All right.  Good.
12          Did you -- what did you do to prepare for
13 this deposition?  I realize it was short notice for you
14 all.
15     A.   Yeah, I mean --
16     Q.   What did you do to prepare for it?
17     A.   I mean, we just discussed a little bit,
18 and that's about it, I mean.
19     Q.   With your lawyer?
20     A.   The attorney, yeah.
21     Q.   Did you discuss it with anyone else,
22 other than your wife?
23     A.   No.
24     Q.   Did you review any documents, any pieces
25 of paper, in order to prepare?

**16**

1      A.   No.  No, we didn't.
2      Q.   Okay.  Where do you live now?
3      A.   Do you want the address?
4      Q.   Yes, sir.
5      A.   It's 2841 St. Charles Place, Pigeon
6  Forge, Tennessee.
7      Q.   And that's about 15 --
8      A.   From the hotel, it's about a
9  five-minutes' drive.
10     Q.   So it's about 20 minutes from here or so?
11     A.   No -- yeah, about 20 minutes from here.
12     Q.   Oh, okay.  And Jagruti, if I'm
13 pronouncing it right, is your wife, right?
14     A.   Yeah.
15     Q.   Does she work outside your house?
16     A.   I mean, she helps me at the hotel.
17 That's about it, yeah.
18     Q.   Okay.  What are her duties at the hotel?
19     A.   I mean, you know, some days she comes,
20 make sure the housekeepers doing their job, and -- and
21 you know, a few odds and ends.  Not every day, you
22 know.
23     Q.   Right.
24     A.   She don't have a fixed schedule.  It's
25 just whenever she feels like she wants to come here.

**17**

1      Q.   What's your educational background?
2      A.   Well, I went to the high school and maybe
3  a couple years of college, basic.
4      Q.   High school here, in --
5      A.   U.S., yeah.
6      Q.   In U.S.?
7      A.   Yeah.
8      Q.   Where did you go to college?
9      A.   In Abingdon, Virginia.  I used to live in
10 Bristol.  So there's a community college in Abingdon,
11 so I went a couple of years there.
12     Q.   Do you know Mrs. Fritz?  Because she went
13 to that community college in Abingdon.
14     A.   No, no, I don't know.  I have no idea
15 about that.
16     Q.   Okay.
17     A.   But I might -- you know, if I see her,
18 but I'm recognizing, no.
19     Q.   Before this lawsuit, you did not know the
20 Fritzes at all?
21     A.   No, no.
22     Q.   Okay.  Do you know if they'd ever stayed
23 in your hotel before?
24     A.   No, I don't know if they did before or
25 not.  But, you know, that day, I know now that they

**18**

1  stayed.  But before, I have no idea.
2      Q.      During the course of this lawsuit, have
3  you met the Fritzes?
4      A.      No.
5      Q.      That's Jessica and Travis Fritz.  Have
6  you met them?
7      A.      No.
8      Q.      And you've never met Mr. Gilreath?
9      A.      No, first time I saw him.
10      Q.      Or Mr. Suggs?
11      A.      Yeah.
12      Q.      Okay.  Are you or you and your wife the
13  sole owners or members of Laxmiji?  And that's
14  L-A-X-M-I-J-I.  Are you the sole owners of that
15  corporation?
16      A.      Me and my wife are, yeah.
17      Q.      Does it own any other properties?  I
18  asked you about hotels, but does it own any other
19  properties?
20      A.      Just the house.  Not any corporation, no.
21  This is the only corporation, is the hotel.  But the
22  house is under our name.
23      Q.      Okay.  But does the corporation own any
24  other hotels?
25      A.      No.

**19**

1      Q.      Or any other properties of any kind?
2      A.      No.
3      Q.      One asset is all it has?
4      A.      That's it.
5      Q.      All right.  When did you buy the hotel?
6      A.      I think 2012; 2012 or '13.  I'm not sure
7  right now.  The date is I think 2013.  I'm not sure.  I
8  don't go by the date that much, you know.
9      Q.      What did you do before you bought this
10  hotel?
11      A.      I had the Royal Inn across the street
12  from that hotel.
13      Q.      Did you own that?
14      A.      Yeah.  Well, it's a leased property.  I
15  owned the business -- the business, but it was under
16  lease.
17      Q.      You mean you had a mortgage?
18      A.      No.  The property was under -- I was
19  paying somebody a lease, ground.
20      Q.      Okay.  Who were you paying?
21      A.      Her name -- her name was Lucy Lemon.
22  She's no more -- she died now.  So I was paying her a
23  ground lease.
24              And me and my partner built that hotel
25  ourselves.  And I bought my partner out, and I was

**20**

1  the -- me and my wife was the owner.
2      Q.      Was that Laxmiji that did it?
3      A.      No, no.
4      Q.      Just you and your wife?
5      A.      No, that was another corporation.  It's
6  called Aemish -- Aemish, LLC.
7      Q.      Can you spell it?
8      A.      I don't even know how.  A-M-I-S-H.
9      Q.      Like the --
10      A.      A-E-M-I-S-H.  Aemish, Aemish.
11      Q.      Like the religion?
12      A.      No, this is no religion.
13              MR. MURRELL:  A-E-M-I-S-H.
14              MR. MCLAREN:  Thank you.
15              THE WITNESS:  It was my partner's son's
16      name, so he wanted to put it under that name.
17  BY MR. MCLAREN:
18      Q.      Okay.  Why did you decide to switch
19  hotels?
20      A.      I mean, this was a leased ground.  And
21  this was -- came to sell at that time, and just bought
22  it.
23      Q.      Was it -- is it bigger?  Is Vista bigger
24  than Royal Inn?
25      A.      As far as the rooms, the same.  But this

**21**

1  one has bigger rooms and suites.  So yeah, it's bigger,
2  yeah.
3      Q.      It's a nicer hotel?  Would you say that?
4      A.      Yeah.  I mean, yeah, yeah.
5      Q.      Okay.  Now, go back to February 14,
6  2014 --
7      A.      '12 -- '14, yeah.
8      Q.      -- when this incident took place, okay?
9              Did you have any prior notice that the
10  carbon monoxide, there was a carbon monoxide problem?
11      A.      No.
12      Q.      Was this the first time the ambulance or
13  any first responders ever came to this hotel to
14  investigate a leak of carbon monoxide?
15      A.      Yes.  First time, yeah.
16      Q.      Okay.  Did you have any kind of prior
17  notice that there was a problem at the hotel with
18  carbon monoxide?
19      A.      Prior notice, no.  I mean, no.
20      Q.      Okay.  Was there any event or was there
21  anything that occurred at the hotel that involved a
22  leak of any kind in the pool, pool area?
23      A.      Before this?
24      Q.      Yes.
25      A.      No, no.

**22**

1    Q.      Okay.

2    A.      No.

3    Q.      Did you ever talk to anybody before this

4    about the heating system for the pool?

5    A.      Talk to somebody about heating system?  I

6    mean --

7    Q.      About a problem with the heating system

8    for the pool.

9    A.      No, there was no problem before that.  So

10   no, nobody was.

11   Q.      How did this problem occur?

12   A.      I mean, to my knowledge, I don't really

13   know at that time.  I mean, it just -- the -- that

14   water heater usually have a cut-off.  They will cut off

15   after a certain temperature.  At that time, it just

16   never cut off.  So that's what's been told to me.

17   Q.      Who told you that?  Do you remember?

18   A.      I mean, the fire department said it

19   stayed on.  So, I mean, that's the thing.  You know, it

20   was on, and they went down, because nobody -- they

21   wouldn't let anybody go down.  So they went down, and

22   then they realized there was a water heater there.

23   Q.      How did you fix it?

24   A.      Just took it all out, didn't have a water

25   heater for a while because I didn't want to put it

**23**

1    anymore in the basement.  So we just took it out, you

2    know.

3            It was there before I bought it, you

4    know.  So we just stopped it and put it all the way

5    outside.

6    Q.      Did the -- did the water heater just heat

7    the pool water --

8    A.      That's it.

9    Q.      -- or the hotel water also?

10   A.      Just the pool.

11   Q.      Did you have to close down the hotel

12   after this happened?

13   A.      Well, the fire department closed down.

14   Not the fire department -- yeah, the fire department

15   and the gas people came and they closed it down,

16   searched everywhere, make sure there is no other leak.

17           And after they opened the doors, within an

18   hour they said "You are ready to open the hotel," because

19   the carbon monoxide, they completely shut down from that

20   equipment.

21           And we opened -- after that, they checked

22   around.  We didn't open it right away.  We wanted to make

23   sure.  But after they told us we opened it, yeah, an hour

24   later.

25   Q.      The Fritzes said that they noticed the

**24**

1    effects of this the morning of February 15th.  Were you

2    open for business the night of February 15th?

3    A.      15th?

4    Q.      Yeah, let me get this clear.  Mrs. Fritz

5    has said that when she woke up on the morning of the

6    15th she was feeling the effects of carbon monoxide,

7    what was later carbon monoxide.

8            Did you evacuate the hotel on the 15th?

9    A.      See, when this thing happened, 90 percent

10   of the people I think left to go wherever they were

11   going, because it was -- you know, Dollywood, or

12   whatever.  I don't know if Dollywood was open.

13           So there was just a few rooms.  Because I

14   wasn't aware, I was at home.  And my desk clerk called

15   me that there was an ambulance and such thing, so I

16   rushed down.

17           The fire department figured out that it

18   was the carbon monoxide going on, so they wouldn't let

19   any -- us -- they were going room to room to get

20   everybody out, but a lot of people were not there.

21           So they got everybody out, went to the

22   basement, opened the door, and shut the gas.  Stick

23   around for a bit, make sure there's no problem.

24           And after that they just came to the

25   office, that there would be no gas at the water heater

**25**

1    for the pool, but you can open the office if you want

2    to rent a room.  So --

3    Q.      So you rented rooms that very next night,

4    the 15th of February?

5    A.      Yeah.  We just shut down the pool, yeah.

6    Q.      Okay.

7    A.      That's all we did.  We had the fire --

8    the gas people came.  We told them we're not going to

9    do anything with that.  I mean, they put a seal on it.

10   So everything was done, we need to redo it.

11           So we asked the gas people, they made --

12   which is the best option for us to do.  So we put the

13   equipment outside after that.

14   Q.      But the hotel hot water was fine, hot

15   showers?

16   A.      Yeah, yeah, no problem.  Yeah.

17   Q.      Okay.

18           MR. MURRELL:  And Bert, if you will let

19   Mr. Murrell finish his question before you

20   answer --

21           THE WITNESS:  Okay.  Sorry.

22           MR. MURRELL:  -- it'll be much easier for

23   the court reporter to keep up.

24           THE WITNESS:  Okay.  Right.  Sorry, yes.

25           MR. MCLAREN:  And I'll try to remember to

26

1       do that, too.
2               THE WITNESS:  This is the first time, so
3       I don't know much what to do.
4               MR. MCLAREN:  I know.
5   BY MR. MCLAREN:
6       Q.      So how long was it before you reopened
7   the pool, about, if you remember?
8       A.      Maybe a week, 10 days later, after we
9   installed.
10      Q.      Did you talk to the Fritzes when you got
11  to the hotel, Mr. and Mrs. Fritz?
12      A.      No.  I mean -- yeah, after an hour or two
13  when they got out of the hospital, they came to the
14  office.
15      Q.      Why did they come to the office?
16      A.      Maybe they had their stuff, because they
17  were supposed to stay over.
18              So they came.  They were pretty mad at me
19  for being the office open.  But I told them the fire
20  department, everybody told us.  That was the only
21  reason we are open; otherwise, we would shut it down.
22              So they got their stuff.  They wanted
23  money, so we gave them their money for the room and
24  checked them out, you know.
25      Q.      Were both Mr. and Mrs. Fritz there?

27

1       A.      Yeah, they both were there.
2       Q.      Did you have a conversation with either
3   one of them?
4       A.      Just the lady, the -- about the -- you
5   know, she needed her money back from the night.  But I
6   give her both nights back to make the matter easy.
7       Q.      They had been there the 13th, too?
8       A.      Yeah, they'd been the 13th, and -- no,
9   they came Friday.  This thing happened Saturday
10  morning, right?  So they were staying Friday, Saturday,
11  and Sunday was checking out.
12              So they came Saturday, about after they
13  came from the hospital.
14      Q.      So you give them refunds --
15      A.      Uh-huh.
16      Q.      -- for both nights?
17      A.      Both nights, yeah.
18      Q.      And that was the same day they went to
19  the hospital that they came back and had that
20  conversation with you, right?
21      A.      I think they went to the hospital around
22  11:00.  They came back around 2:00, 3:00.
23      Q.      Okay.
24      A.      I'm not sure.  Don't get me on time.
25  That's an estimate.

28

1       Q.      I understand.  I understand.
2               You said she was mad.  Do you remember
3   what she said?
4       A.      No, I don't know.  I mean, right now I
5   don't know honestly what -- how it was.  But I
6   recognized that she was unhappy because I had the
7   office open.  And I said, "It was not my call.  They
8   told me to do it.  So, I mean, I'm doing it.  And I
9   have a lot of people here.  And I would have -- if they
10  told me to shut it down, I would let everybody leave."
11              But as long as I did there --
12      Q.      Did they have their baggage and stuff
13  still up in the room, or did you move it to the front
14  office?
15      A.      No, I just left it there.
16      Q.      So you let them back into that room to
17  get their stuff?
18      A.      See, right at this moment I'm not sure
19  what really happened, if they had luggage or whatever.
20  But they came back, and I gave them their money refund.
21              And if they went in the room or not, I
22  have -- that, I'm just guessing that they -- that's the
23  reason they came back, you know.
24      Q.      Did you see them leave to go to the
25  hospital?

29

1       A.      Yeah.  The ambulance was there and they
2   took them, yeah.
3       Q.      So you were --
4       A.      I was there, yeah.
5       Q.      Did you talk to them before they got into
6   the ambulance?
7       A.      No, no, no.
8       Q.      It was just after they came back?
9       A.      Yeah, just for a brief.
10      Q.      And you'd never seen them before or knew
11  them before or anything?
12      A.      No, never seen them.
13      Q.      Do you know if they had ever stayed in
14  your hotel before?
15      A.      I don't know if I did.  Maybe.  I have no
16  idea.
17      Q.      Okay.  You had insurance on the hotel,
18  right?
19      A.      Yeah.
20      Q.      And your primary carrier was Liberty; is
21  that right?  That was your first policy, Liberty
22  Insurance?
23      A.      It might be.  I don't know the name right
24  now, honestly.
25      Q.      Okay.

```
1       A.      But I had insurance.
2       Q.      You had insurance?
3       A.      Yeah.
4       Q.      And your umbrella policy, or your excess
5  policy, was with St. Paul.  Correct?
6       A.      Probably.  I mean, I do not know the
7  name.
8       Q.      Okay.  Who handled your insurance for
9  you?
10      A.      It's MIG, is the agent in Knoxville.
11      Q.      Okay.
12      A.      The other one who I got the insurance
13 from.
14      Q.      Did they send you the policies?
15      A.      Uh-huh.  Yeah, after.
16      Q.      And you got them here in Tennessee at
17 Pigeon Forge or wherever you were, right?
18      A.      Yeah, the policy after -- after I got the
19 insurance, yeah.
20      Q.      Do you have a separate office other than
21 the hotel?
22      A.      No.
23      Q.      Okay.  Let me hand you a copy of a letter
24 from MIG to you.
25              MR. MCLAREN:  And that will be Exhibit
```

```
1  No. 3.  I made Exhibit 2 the policy.  I'll get to
2  it in a minute.  But this will be Exhibit No. 3,
3  and here you go.
4              (Exhibit No. 3 marked.)
5  BY MR. MCLAREN:
6       Q.      Mr. Patel, when you said "MIG," look at
7  that letter.  That's Madison Insurance Group, right?
8       A.      Yes.
9       Q.      And that was a letter to you November 25,
10 2013, right?
11      A.      Yes, it says number -- let's see; yeah,
12 25, yeah.  Yeah.
13              MR. MCLAREN:  Can I see Exhibit 1,
14      please?  Oh, never mind, it's right here.
15 BY MR. MCLAREN:
16      Q.      I didn't prepare the original Complaint
17 here, but your name on the original Complaint is
18 spelled B-H-A-R-A-T.  On this letter, it's B-H-A-R-T.
19 That's you, the same guy, right?
20      A.      Yeah, yeah, yeah.  Yes, it's me.
21      Q.      Okay.  Now, it looks like in this letter
22 they're sending you three insurance policies.  The
23 Burlington Insurance commercial property insurance
24 policy, do you know what that is?
25      A.      Right now, I don't know.
```

```
1       Q.      Amtrust International general liability
2  insurance policy.  Do you know what that is?
3       A.      No.
4       Q.      Okay.  And then St. Paul Insurance
5  umbrella policy.  Do you know what that is?
6       A.      You just told me.  But that's it, yeah.
7       Q.      Okay.  You don't have any knowledge?
8       A.      No, no, no.
9       Q.      It said it's a letter from Darlene
10 Giles -- G-I-L-E-S.  Do you know her?
11      A.      Yeah.  She's one of the agents at MIG,
12 yeah.
13      Q.      Okay.  She says in there, in the first
14 paragraph:  "Please review each policy carefully to
15 verify its accuracy and file it with the corresponding
16 expired policy or related papers."
17              Did you do that?  Did you review each
18 policy carefully?
19      A.      No.  I asked him, you know, the agent,
20 you know -- I mean, it's a lot of pages.  I mean,
21 basically, a lot of times you don't read it.  I mean,
22 you ask the agent, make sure everything is covered.
23      Q.      Right.
24      A.      And that, you know -- and that's why he
25 -- he told me everything was covered, I mean, from top
```

```
1  to bottom, any accident or whatever happens.
2              So that was told by him, so I
3  never really, no.
4       Q.      Do you know anything about the agency
5  relationship between MIG and the Burlington, Amtrust,
6  or St. Paul?
7       A.      I don't know about nothing.
8       Q.      Okay.  It says in Paragraph 2, "We
9  strongly urge you" -- I'm quoting now:  We strongly
10 urge you to read your policy thoroughly in order to
11 avoid any misunderstandings regarding the scope of your
12 insurance coverage.
13              You didn't do that, did you?
14      A.      I don't even know if I had this paper at
15 that time.  I mean, that -- it never --
16      Q.      My question is simple.
17      A.      Yeah.
18      Q.      You didn't read the insurance policies,
19 did you?
20      A.      No, I go according to their saying.
21      Q.      All right.  Did you know the limit of the
22 Liberty policy, your first line of insurance?  Did you
23 know what those limits were, how much money you were
24 covered for?
25      A.      Not right now, no.
```

**34**

1    Q.    Okay. If you learn that, could you
2  furnish that to your attorney, just the -- on the front
3  of the Liberty policy there will be a declarations
4  page, and it'll say how much your coverage is.
5    A.    Yeah, it does, but I -- like right now,
6  yeah, it's been for two, three years, so I don't know
7  what was the coverage was.
8    Q.    Okay. There was some testimony last week
9  by Mr. and Mrs. Fritz that the coverage of the Liberty
10  policy was $1 million. Does that sound right to you?
11    A.    I don't know. I do not know right now.
12    Q.    Do you know if Liberty Insurance Company,
13  your primary carrier, paid the Patels -- the Fritzes $1
14  million plus interest?
15    A.    I don't know. I don't know.
16    Q.    Have you ever heard that before, that
17  they got paid by Liberty Insurance Company for $1
18  million?
19    A.    I don't know the amount, but, I mean, you
20  know, I mean, we discussed that they probably had got
21  paid. But not the amount. I'm not sure.
22    Q.    Okay. You think this is the first time
23  you're hearing that they received $1 million from
24  Liberty?
25    A.    Yeah, money was -- yeah, that, I don't

**35**

1  know. But I know we discussed that, you know, because
2  of this is going on that they have received some kind
3  of money, or....
4    Q.    Okay. Look at --
5    MR. MCLAREN: If you could hand Mr. Patel
6    the policy. I don't have a copy for you because
7    it was too heavy to carry.
8    MR. MURRELL: That's all right.
9    THE WITNESS: Yeah, that's the policy.
10  BY MR. MCLAREN:
11    Q.    Now, remember, I represent St. Paul Fire
12  and Marine Insurance Company, or Travelers. I'm using
13  those interchangeably. And this is your policy with
14  St. Paul Fire and Marine Insurance Company.
15    A.    Uh-huh.
16    Q.    Have you ever -- you've not read this
17  thoroughly, right?
18    A.    Huh-uh, no.
19    Q.    Okay. I want you to go to what's on the
20  bottom here. It says "Page 2 of 68." That's the best
21  way I can identify it for you.
22    A.    This is 18, so --
23    Q.    Yeah. I folded it over for you.
24    A.    Yeah, yeah, I have one -- well, one
25  and --

**36**

1    Q.    I folded over a piece of paper for you.
2  Right there.
3    A.    Yeah.
4    Q.    Okay. Do you see where it says "Agent,
5  McGowan & Company, Inc.?" Do you see where it says
6  that?
7    A.    Yeah, uh-huh.
8    Q.    Did you read that at the time you got
9  this policy?
10    A.    No.
11    Q.    Okay. Turn to Page 6 of 68. That was
12  folded over, too. And this says, and I'm quoting:
13  What to do if you have a loss. Specialty commercial
14  umbrella liability policy.
15    Have you ever read this page before today?
16    A.    No.
17    Q.    Okay. Had you ever discussed this page
18  with anybody before today?
19    A.    No.
20    Q.    It says: "When an occurrence happens or
21  is committed that likely will result in damages that
22  are covered by this policy, you or any insured are
23  required to report the claim to" -- it's got an
24  address; the Travelers Companies Inc., Attention Excess
25  Claims, up in Hartford, Connecticut.

**37**

1    Have you ever read that language before?
2  You never did that, you never reported the loss to
3  Travelers, did you?
4    A.    No, I just reported to the agent.
5    Q.    Right.
6    A.    And that's what -- if anything happened,
7  that's what we do first thing. You know, we get
8  insurance from them, the company is here, so we report
9  it to them. And then if they report it to you, this
10  company, I don't know.
11    Q.    Right. You don't have any knowledge
12  whether anybody ever reported this loss to St. -- to
13  Travelers Companies, Inc., do you?
14    A.    No.
15    MR. MCLAREN: Okay. That's marked, I
16    think, Exhibit 2.
17  BY MR. MCLAREN:
18    Q.    Do you know what the limits of this
19  policy were?
20    A.    Right now, I have no idea. I mean, the
21  umbrella, you're talking about?
22    Q.    Yes; yes, sir.
23    A.    I mean, it says $5 million, right? Yeah.
24    Q.    Okay. Were you aware of that before
25  you --

**38**

1     A.    Yeah.  When I got it, I probably know
2 like probably $5 million.  But over the years I forget,
3 you know, what -- it could be a million or five
4 million.  No idea.
5     Q.    Have you ever heard of the McGowan
6 Company before?
7     A.    No.
8     Q.    How did you happen to hire MIG -- Madison
9 Insurance Group -- as your agent?
10     A.    I talked to Joel.  I don't know the name
11 you're telling me.  Joel is the agent that I deal with.
12     Q.    Okay.  What's his last name?  Do you
13 know?
14     A.    I don't know.
15     Q.    Ammons?  A-M-M-O-N-S?
16     A.    Ammons.  That's it, yes.
17     Q.    Okay.  How did you come to meet him?
18     A.    Somebody told me about the insurance -- I
19 was with somebody else -- and give him a trial.  And he
20 had -- you know, the price was good and got him to bill
21 it.
22     Okay.  Let me get back to this day in
23 question.  Did you pay the Fritzes' medical expenses?
24     A.    I think I did.  I'm not sure right now,
25 but I think I called and paid it, or I -- I know I

**39**

1 tried to call, because....
2     Q.    Okay.  Let me hand you -- wait a minute.
3 You said you knew you tried to call.  Who did you try
4 to call?
5     A.    I tried to -- the hospital people calling
6 us, said "Who is going to take care of the bill?"  So
7 somehow, we got the phone number.  I called the Fritzes
8 and said, "Hey, if you're released I'll go ahead and
9 pay for the doctor bill."
10     Q.    What did he say?
11     A.    Huh?
12     Q.    What did he say?
13     A.    I'm not sure at that time.  I mean, if
14 it's listed that I paid it or not, I'm not sure.  If it
15 says that I paid it, then I probably paid it.
16     (Cellphone interruption.)
17     MR. MCLAREN:  Sorry.
18 BY MR. MCLAREN:
19     Q.    Do you know the amount?
20     A.    No.
21     Q.    All right.  Let me hand you a letter from
22 Mr. Murrell to Mr. Ammons.
23     A.    Joel?
24     Q.    Yeah, Joel.
25     MR. MCLAREN:  You can go ahead and mark

**40**

1 that as Exhibit 4.
2     (Exhibit No. 4 marked.)
3 BY MR. MCLAREN:
4     Q.    In the bottom there, Mr. Murrell says --
5 the bottom of the first paragraph, quote:  I would ask
6 you to immediately tender the Summons and Complaints to
7 the appropriate insurer so that they may provide a
8 defense in this case.  Close quote.
9     Do you have any knowledge whether that was
10 ever done as to St. Paul or Travelers?
11     A.    No, I don't know.
12     Q.    Okay.  And then Mr. Murrell says that
13 he's aware that when the insurer was, quote, previously
14 made aware of this potential claim, they denied
15 coverage.
16     Do you know anything about that?
17     A.    What is it, please?
18     Q.    About any insurance company -- company
19 denying coverage for this incident?
20     A.    Yeah, they called me.  The agent did call
21 me, then somebody else from the company, one of the
22 companies, that -- telling me that we do not cover this
23 carbon monoxide accident.
24     Q.    Was that --
25     A.    So that's when, you know, I talked to

**41**

1 Jeff Murrell and tried to figure out what to do, you
2 know.
3     Q.    Okay.  That was somebody from Liberty
4 that called you, right?
5     A.    One -- yeah, main insurance company,
6 yeah.
7     Q.    Yes?  Okay.
8     MR. MCLAREN:  And then it looks like nine
9 days later, Mr. Murrell sent a letter again to
10 Joel.  And we'll make this Exhibit 5.
11     (Exhibit No. 5 marked.)
12 BY MR. MCLAREN:
13     Q.    And Mr. Murrell said -- have you ever
14 seen this letter before?
15     A.    No.
16     Q.    Mr. Murrell says that, quote:  He -- it's
17 not in quotes.  Mr. Murrell said that he, quote, had
18 received no response from the insurance company.  Close
19 quote.
20     Do you know anything about that at all?
21     A.    About?
22     Q.    About the fact that the insurance company
23 hadn't responded to Mr. Murrell?
24     A.    No, I don't know.  I mean, they -- I let
25 him handle it, and so....

42

1    Q.    Of course.  As we sit here today, you
2    have no idea if St. Paul or Travelers ever had any
3    knowledge about any of this, do you?
4    A.    No.
5          MR. MCLAREN:  Okay.  Now let me hand you
6    a letter, and I want to get it marked as Exhibit
7    6.
8          (Exhibit No. 6 marked.)
9          THE WITNESS:  Oh, you have it.
10   BY MR. MCLAREN:
11   Q.    Yes.  You can take as long as you want to
12   read this, but it's a letter to you with yet another
13   spelling of your first name.  This time, it's B-E-R-T.
14   But that's you?
15   A.    That's why I shorten it down, so it is
16   easy to pronounce.
17   Q.    Sure.
18   A.    I should go by Bob, it would be a lot
19   easier to do it.  I'm sorry.
20   Q.    But that's you, one in the same guy,
21   right?
22   A.    Yes, the same thing.  Yeah.
23   Q.    Okay.  Now, this starts off with -- this
24   Exhibit 6, it starts off with a disclaimer of coverage.
25   This one is addressed to you at your address, 2647

43

1    Parkway.  Right?
2    A.    Yes, 2647.
3    Q.    Okay.  And it says that Propoint Claims
4    Service is the claims administrator on behalf of
5    Liberty Surplus Insurance Company.
6          Liberty Surplus was your main carrier,
7    right?
8    A.    Yeah, I guess.  Yeah.
9    Q.    Okay.  And whoever wrote this, Beth
10   Levine, says that Liberty is telling you there's no
11   coverage.  Do you see that in the first paragraph?
12         (Witness reviews document.)
13         THE WITNESS:  Yeah.
14   BY MR. MCLAREN:
15   Q.    You didn't get any letter like this from
16   St. Paul or Travelers that you know of, did you?
17         MR. MURRELL:  Speak up so they can hear
18   you.
19         THE WITNESS:  Yes.  All right.  I am just
20   mumbling my answer.  Yeah, correct.
21   BY MR. MCLAREN:
22   Q.    All right.  I know that Liberty paid
23   money to the Fritzes; but to your knowledge, did they
24   ever change their position that they didn't owe any
25   coverage?

44

1    A.    I don't know -- understand.  What are you
2    saying?
3    Q.    Do you know whether Liberty ever did give
4    coverage?  You know they paid money, but it's two
5    different things.  One is saying "We're not admitting
6    coverage and paying money," or "We're admitting
7    coverage and here's money."  Do you know which of those
8    they did?
9    A.    I don't think I know, no.
10   Q.    Okay.  I didn't think you would.
11   A.    No, huh-uh.
12         (Exhibit No. 7 marked.)
13   BY MR. MCLAREN:
14   Q.    Okay.  Here's a second letter, which will
15   be Exhibit 7 to this.  It's another letter from
16   Propoint sent to you.  I'm sorry, this is sent to you
17   and your wife and Laxmiji.
18   A.    Uh-huh.
19   Q.    And then go down to Paragraph 2.  And
20   they say, quote:  Based upon our review, must
21   regretfully inform you there's no coverage under the
22   policy for this matter.  Close quote.
23         My question is:  Did you get this, or do
24   you think you did?
25   A.    Again, I think I did, but I'm not right

45

1    -- right now I'm not sure, you know.
2    Q.    Okay.  Did you ever get a letter like
3    this from St. Paul or Travelers?
4    A.    We didn't get it, no, I don't think so.
5          MR. MCLAREN:  Okay.  All right, for
6    Exhibit 8.
7          (Exhibit No. 8 marked.)
8    BY MR. MCLAREN:
9    Q.    This is a letter that looks like it's to
10   you.  I suspect your attorney helped you draft this or
11   even drafted it.  Am I right about that?
12   A.    Yeah.  He helped me with lots, I mean,
13   you know.
14   Q.    Okay.  And this says, in Paragraph 2 --
15         MR. GILREATH:  Who is it addressed to?
16         MR. MCLAREN:  It's addressed to the woman
17   who's been writing these letters on behalf of
18   Liberty, Beth Levine.
19   BY MR. MCLAREN:
20   Q.    And it says, referring to Liberty:  "Your
21   company has constructively abandoned us, as well as our
22   business.  In light of the same, we have no choice but
23   to confess judgment."
24         My only question is, did you send a
25   letter like this to St. Paul or Travelers that I

**46**

1  haven't seen?

2  **A.      To be honest with you, it wasn't me, I**

3  **don't think, no.**

4  Q.      You don't know of any letter sent to

5  St. Paul or Travelers like this?  Am I right about

6  that?

7  **A.      Yeah, yeah.**

8  Q.      Okay.  And the last exhibit in this

9  series is going to be a letter to your attorney.

10  That's Exhibit 9.

11          (Exhibit No. 9 marked.)

12  BY MR. MCLAREN:

13  Q.      This is a letter to your attorney

14  directly from Liberty this time, not from Propoint.

15  And it's a different woman.  It's called Rachel Merin,

16  M-E-R-I-N.

17          And if you look at the second paragraph,

18  they're writing to Mr. Murrell and saying, quote:  We

19  again deny the insurance request for defense and

20  indemnification.  That's referred to as a denial letter.

21          As we sit here today, you don't know if you

22  ever got one of these from St. Paul or Travelers, do you?

23  **A.      I don't know.  I don't think so, but, I**

24  **mean....**

25  Q.      Okay.  Did Mr. Murrell tell -- well, were

**47**

1  you aware of this denial of coverage?

2  **A.      From when?**

3  Q.      From either Mr. Murrell, or did you get

4  copied here, or from these prior letters?  Anyway, you

5  knew nobody was giving you coverage in this case,

6  didn't you?

7  **A.      Yeah.**

8  Q.      Okay.  Going back to this payment, did

9  you -- did you pay the Fritzes' medical bills or some

10  portion of them out of your own pocket?

11  **A.      Did I?  No, I'm not sure if I paid or**

12  **not.**

13  Q.      Okay.

14  **A.      I mean, if you show me a paper, I would**

15  **know, you know, if it's on there.**

16  Q.      All right.  If I had one, I would.

17  Q.      Okay.  I want to talk to you a little bit

18  about the lawsuit and what happened in the lawsuit.

19          When you got your Summons and Complaint in

20  the lawsuit --

21          MR. MCLAREN:  Sorry, I'm having

22      microphone problems here.

23  BY MR. MCLAREN:

24  Q.      When you got your lawsuit -- your Summons

25  and Complaint in the lawsuit, did you turn it over to

**48**

1  your attorney?

2  **A.      Yeah, yeah.**

3  Q.      Okay.  And I'm going to hand you what's

4  previously been marked in the Fritzes' depositions.

5  It's a Judgment for Damages.

6          MR. MCLAREN:  And that's going to be

7      Exhibit 10.

8          (Exhibit No. 10 marked.)

9  BY MR. MCLAREN:

10  Q.      And I'm going to first ask you, do you

11  remember getting sued by the Fritzes?

12  **A.      Yeah, yeah.**

13  Q.      Did some sheriff or some process server

14  come to your business and hand you Complaints, the

15  lawsuit --

16  **A.      I think it -- it just came in the mail.**

17  Q.      Came in the mail?

18  **A.      Yeah.**

19  Q.      Okay.

20  **A.      Just regular mail.**

21  Q.      And you turned it over to Mr. Murrell,

22  right?

23  **A.      Yeah.**

24  Q.      All right.  This is called a Judgment for

25  Damages.  And if you read it, it looks like that there

**49**

1  was a hearing and somebody testified, and the judge

2  issued a Judgment for Damages.

3          My question is:  Were you there in court

4  when this happened?

5  **A.      No, no, I wasn't there.**

6  Q.      Did you ever go to court in this matter?

7  **A.      No, no.**

8  Q.      The judge is named Hooper, Ben Hooper.

9  Did you ever appear in his courtroom and see him?

10  **A.      No.**

11  Q.      Do you know if Mr. Murrell did?

12  **A.      I don't know.**

13  Q.      Okay.  The judgment lists past medical

14  bills, Jessica Fritz, looking down at the bottom.  Do

15  you see that?

16  **A.      Yeah.**

17  Q.      That's $26,147.20.  Have you ever seen

18  those bills?

19  **A.      Probably, when I got the letter, it might**

20  **be in there.**

21  Q.      I mean --

22  **A.      When I got the lawsuit letter or**

23  **something.**

24  Q.      The lawsuit letter?  Okay.

25  **A.      Yeah.**

**50**

1     Q.     Do you know if any of those bills were
2  some of those you think you might have paid?
3     A.     No.
4     Q.     Okay.  Do you know anything about these
5  other damages that the Fritzes claim to have which
6  total six -- $20 million?
7     A.     Can you repeat what you said?
8     Q.     Sure.  Do you know anything about this
9  list of damages that the Fritzes maintain they suffered
10  in the amount of $20 million?
11     A.     I got this paper.  But, I mean, I don't
12  know if they settled or what they settled for, you
13  know.
14     Q.     Okay.  You don't know why Travis Fritz
15  got pain and suffering for $6,847,791.48, do you?
16     A.     No, I don't.
17     THE WITNESS:  After this question, after
18     you do this, can I take a break?
19     MR. MCLAREN:  We can take a break right
20     now.
21     THE WITNESS:  Is that a --
22     MR. MCLAREN:  Sure.
23     THE VIDEOGRAPHER:  The time is 10:46.
24  We're going off the record.
25     (Recess at 10:46 a.m. to 10:51 a.m.)

**51**

1     THE VIDEOGRAPHER:  The time is 10:51, and
2     we are back on the record.
3  BY MR. MCLAREN:
4     Q.     Mr. Patel, we were talking about this
5  Judgment for Damages, Exhibit 10.  How did you learn
6  about this, or did you?  When did you learn about it?
7     A.     About the lawsuit amount, or?
8     Q.     Yes, of the $20 million in this Judgment
9  for Damages.
10     A.     I mean, it came in the mail, and that's
11  why we know.
12     Q.     From your attorney, or from the court, or
13  from Mr. Gilreath?  Do you know how it came?
14     A.     Their attorney, I think.  Fritzes'
15  attorney.
16     Q.     Okay.  And you turned it over to
17  Mr. Murrell?
18     A.     Jeff, uh-huh.
19     Q.     Were you aware of or part of any
20  conversations with the Fritzes about dollar amounts
21  they were claiming?
22     A.     Not -- I don't talk with them, so I
23  don't --
24     Q.     Did you talk to Mr. Gilreath?
25     A.     No, I didn't talk to him.  I just seen it

**52**

1  in the paper -- I mean letter, that the money was that
2  much.
3     Q.     Okay.  Did you ever talk to Mr. Murrell
4  about it and Mr. Suggs about it?
5     A.     Who?
6     Q.     Mr. Suggs.
7     A.     Who is he?
8     Q.     The Fritzes' attorney.
9     A.     No, I never talked to them.  It was my
10  attorney talking to them, yeah.
11     Q.     So the only thing you knew about was when
12  you got this Exhibit 10, the Judgment for Damages for
13  $20 million?
14     A.     Yeah.
15     Q.     This date on here is January 6th, 2016.
16  And what you're saying is that before you got this
17  Judgment for Damages, Exhibit 10, there was no
18  discussion that you know of at all about amounts of
19  damages; is that right?
20     A.     What date is it?
21     Q.     January 6th, 2016.
22     A.     I don't know exactly what date I got the
23  letter, but --
24     Q.     Well, it would have been after that.  But
25  my question is:  Before January of 2016, were you aware

**53**

1  of or did you participate in any discussions with the
2  Fritzes or anybody on their behalf about damages?
3     A.     No, not with them.  No.
4     Q.     So the first you knew that there was 20
5  million out there is when you got this judgment, right?
6     A.     Yeah.
7     Q.     Okay.
8     A.     Not judgment.  I mean, they sent us a
9  letter about the $20 million claim.  Then we seen the
10  judgment, the $20 million.
11     Q.     Okay.
12     A.     They were suing us for $20 million that
13  came as of before the year was ending in probably 2015.
14  But the judgment that we know later in time, yeah.
15     Q.     Okay.
16     MR. MCLAREN:  Let me hand you what I'm
17     going to mark Exhibit No. 11, which is a letter
18     from your attorney to Mr. Gilreath.
19     (Exhibit No. 11 marked.)
20  BY MR. MCLAREN:
21     Q.     And this is May of 2015 -- May 4th.  And
22  by now, had you talked to Mr. Murrell?  I don't want
23  you to tell me what you guys discussed, but by now have
24  you talked to him about this $20 million Consent
25  Judgment?

**54**

1    A.    Yeah, we talked to him.

2    Q.    Okay.  He says that -- Mr. Murrell says

3  in this letter, quote:  My clients had no notice of the

4  default judgment being taken against them until you and

5  I talked on April 22, 2016.

6        Is that true --

7    A.    No.

8    Q.    -- you didn't know anything about the

9  default judgment?

10   A.    No.

11   Q.    You never got served with anything about

12 a default judgment?

13   A.    No.

14   Q.    Or you never got a letter about a default

15 judgment?

16   A.    No.

17   Q.    If you keep reading there, I'm quoting

18 now in the middle of that first paragraph.  Quote:  As

19 you may recall, you and I -- that would be Mr. Murrell

20 and Mr. Gilreath -- were engaged in discussions

21 throughout the summer of 2015 with regard to a Consent

22 Judgment being entered against Laxmiji, LLC, and my

23 clients would assign any and all rights they may have

24 against the insurance companies in an exchange for an

25 agreement not to execute on the judgment against my

**55**

1  clients.  Close quote.

2        I'm asking you, were you aware of those

3  discussions where you wouldn't owe any money but you'd

4  sign something saying "You can go pursue insurance

5  claims?"

6    A.    Yeah, we discussed with attorney, Jeff

7  Murrell, and he gave me, you know, this advice to do

8  so.

9    Q.    Okay.  And then Mr. Murrell says, quote:

10 I -- I'm just continuing to read here.  I provided you

11 with complete copies of their insurance policies, as

12 well as the letter from the insurer denying coverage.

13 Close quote.

14        Did -- to your knowledge, is he referring

15 to that letter from Liberty Mutual or Liberty Insurance

16 Company denying coverage?

17   A.    No, it doesn't say that in here.

18   Q.    It refers to a letter, just one.

19   A.    Okay.

20   Q.    Is that the only letter you know of from

21 anybody denying coverage?

22        MR. MURRELL:  Well, I think we've

23    referenced these separate letters, so --

24 BY MR. MCLAREN:

25   Q.    Right.  Those letters are all from

**56**

1  Liberty, correct, or Liberty's administrator, Propoint?

2    A.    I think so, yeah, yeah.  Just this one.

3    Q.    Do you know if Mr. Murrell and

4  Mr. Gilreath ever had any discussions about the caps on

5  pain and suffering in Tennessee?  Do you know what that

6  means?

7    A.    Not me.  I don't know.

8    Q.    Okay.  And you don't know if there was

9  ever any discussions about that, do you?

10   A.    Well, I mean, he discussed with him -- I

11 mean, he told me what was -- the individual is, and

12 then, you know, I mean, he discussed with him.  I'm not

13 sure, I mean.

14   Q.    Were you surprised that Travis Fritz got

15 over $6 million for pain and suffering?

16   A.    I mean, I'm surprised, yeah.  But, I

17 mean, what the attorney does, I don't know, I mean, you

18 know.

19   Q.    Do you know if any discussion was ever

20 made involving a judgment for less than $20 million?

21   A.    Any judgment on this thing, or --

22   Q.    Yes.

23   A.    No, not less than anything.  I mean, this

24 was -- the judgment came, and that was -- I know that

25 that was that amount, nothing different.

**57**

1    Q.    So you don't know of any discussions

2  about "Okay, if you take $10 million we'll do this; or

3  $5 million, we'll do this."  Do you know of any such

4  discussions?

5    A.    No.

6    Q.    Has anybody ever tried to collect money

7  from Laxmiji?

8    A.    No.

9        (Exhibit No. 12 marked.)

10 BY MR. MCLAREN:

11   Q.    Let me hand you what's been marked as

12 Exhibit 11 -- 12, which this is a pleading before Judge

13 Hooper in which it says -- it's a Motion to Set Aside

14 Default Judgment and Judgment for Damages.

15        And there's an affidavit on the fourth

16 page in that is signed by you.  Is that your signature

17 down there?

18   A.    Yeah, that's my signature.

19   Q.    Okay.  And this says that you didn't get

20 any Motion for Default Judgment or default judgment

21 pleadings or anything like that.  Is that your

22 testimony, as we sit here today?

23   A.    Yeah.

24   Q.    And that was the affidavit you signed,

25 right?

58

1    A.    Yeah, this is what I signed.  Yeah.
2    Q.    Okay.  Do you know what happened as a
3 result of this motion to set aside the $20 million
4 judgment?
5    A.    No, no.
6    Q.    Were you leaving that completely to your
7 attorney?
8    A.    My attorney, yeah.
9         (Exhibit No. 13 marked.)
10 BY MR. MCLAREN:
11    Q.    After that, it looks like everybody
12 reached an agreement.
13         I will pass you what's been marked
14 Exhibit 13, and this has been signed 28 November 2016.
15         It looks like everybody agreed to start
16 over, setting aside Default judgment and Judgment for
17 Damages.
18         Were you aware of this when it was entered
19 into?
20    A.    Yeah, yeah.  I talked to Jeff, yeah.
21    Q.    And this says that that judgment, the $20
22 million judgment -- and I'm reading the last line on
23 Page 1 -- "Is likewise set aside and declared null and
24 void ab initio."
25         Was that your understanding, there was no

59

1 more judgment as of November 28, 2016?
2    A.    Yeah.
3    Q.    As we sit here today, you don't know if
4 anybody sent not just this pleading but any pleading in
5 this case to my client, St. Paul or Travelers, do you?
6    A.    No, I don't know --
7    Q.    Okay.
8    A.    -- if they did or not.
9    Q.    Okay.  After the judgment was set aside,
10 do you know whether there were any discussions to make
11 a future judgment less than $20 million?
12    A.    I don't know.
13    Q.    Do you know whether there were any
14 negotiations to make it less than $20 million?
15    A.    I'm not sure.  I let my attorney handle
16 it; so he would know more about it, if there is less or
17 not.
18    Q.    Okay.  The same day that this order
19 undoing everything, if you will, setting aside Default
20 Judgment and Judgment for Damages, that very same day
21 there was another consent Judgment for Damages that I'm
22 marking Exhibit 14.
23         (Exhibit No. 14 marked.)
24 BY MR. MCLAREN:
25    Q.    I'm going to ask you here, it says that

60

1 it's agreed by you that Laxmiji would consent to a $20
2 million judgment.  Did you do that?
3    A.    I discussed with my attorney.  He can
4 answer it better than me, you know.
5    Q.    Okay.
6    A.    I mean -- so, I mean, we probably done
7 it, yeah.  But, I mean, he -- I let him handle most of
8 the stuff like this, with that, so....
9    Q.    Okay.  It also says here there was going
10 to be, quote, a dismissal with prejudice of all claims
11 against you and your wife, Bharat Patel and Jagruti
12 Patel.  Did you agree to that?
13    A.    Yeah, yeah.
14    Q.    Okay.  Did you have a meeting with your
15 attorney just prior to the time this was entered such
16 that this would all be a done deal and you'd get out of
17 the lawsuit and assign any rights to insurance
18 companies?
19    A.    I mean, we sat down at his office and
20 discussed about it, what is in my best -- for my -- me
21 and my wife best, and the business, what we need to do.
22 So that's what he -- he recommended.  This is the best
23 option we have.
24         MR. MCLAREN:  Okay.  Now, Exhibit 15 is
25    an agreement you made with the plaintiffs in the

61

1    case.  It's a letter and an agreement.  Let me
2    hand the court reporter a copy and ask that she
3    mark it Exhibit 15.
4         (Exhibit No. 15 marked.)
5 BY MR. MCLAREN:
6    Q.    And the copy I have on the back page is
7 signed by Jessica Fritz and Travis Fritz.  Do you see
8 that?
9    A.    Uh-huh.
10    Q.    It's the only copy I have.  Do you have a
11 copy of this -- or does your attorney, that you know
12 of -- where you signed it?
13    A.    I do not have it.  But, I mean -- I mean,
14 I don't know if Jeff has it or not.
15    Q.    Let me ask you this.  Did you sign this?
16    A.    Right now, I don't know --
17    Q.    Okay.
18    A.    -- at this point if I signed it or not.
19 I'm not going to say "Yes" or "No," because I might not
20 know, you know.
21    Q.    Okay.
22    A.    So it doesn't show on here that I signed
23 it, but, I mean --
24    Q.    You don't know if you signed it or not?
25    A.    Right.  If it's the original or not, I

**62**

1  don't know. That's the reason I'm saying.
2      Q.    Okay. Now, this document, called Release
3  and Settlement, is -- deals with releasing you from the
4  lawsuit. And look about, oh, I don't know, five pages
5  down. It's signed by Jessica Fritz and Travis Fritz,
6  in front of a notary. Do you see that?
7      A.    Yeah, this one right here. Yeah.
8      Q.    Okay. And there's no place there for you
9  to sign it, is there?
10     A.    No.
11     Q.    All right. And the next page is an
12 Assignment to Benefits. And I want you to look at the
13 last page again, because I asked about you
14 individually. There's also a signature line for
15 Laxmiji. Who could sign on behalf of Laxmiji?
16     A.    I do.
17     Q.    All right. You don't know if you signed
18 this one or not on behalf of Laxmiji, right?
19     A.    No.
20     MR. MURRELL: You want to go off the
21     record and let me get a copy of the fully
22     executed?
23     MR. MCLAREN: I don't care.
24     MR. MORRELL: It's up to you.
25     MR. MCLAREN: I don't care. I don't need

**63**

1      one.
2      MR. MORRELL: Okay.
3  BY MR. MCLAREN:
4      Q.    Look at Page 1 of the Assignment of Claim
5  to Benefits, which it's marked Page 1 of the document
6  you're looking for.
7      A.    Okay.
8      Q.    I don't think you'll know the answer to
9  this question, but the Liberty --
10     A.    It's okay. You can tell me and I can
11 probably --
12     Q.    All right. Paragraph 2, where it says
13 "Whereas, Laxmiji and Patels are owners." Do you see
14 that?
15     A.    Yeah, yeah.
16     Q.    Okay. It's got a policy number for
17 Liberty but it's got an evidence number for Travelers.
18 Do you know what that means?
19     A.    No.
20     Q.    Okay. As we sit here today -- go back a
21 minute to Exhibit 14, this Consent Judgment for
22 Damages. I think it's the prior piece of paper there.
23     A.    Yeah.
24     Q.    As we sit here today, you don't know if
25 anybody ever got permission from St. Paul or Travelers

**64**

1  for you to enter into this Consent Judgment, do you?
2      A.    No, I don't know.
3      Q.    Okay. The St. Paul and Travelers policy
4  says that you can't enter into a Consent Judgment
5  without notifying them and letting them know. But you
6  don't know if Mr. Gilreath or anybody associated with
7  St. Paul or Travelers ever knew about the Consent
8  Judgment, right?
9      A.    I don't know, right.
10     Q.    Were you in communications with Madison
11 Insurance Group about the Consent Judgment?
12     A.    No.
13     MR. MCLAREN: I need to find a letter
14     here. I only have a few more questions, but let's
15     take a little break so I can find what I'm looking
16     for.
17     THE VIDEOGRAPHER: The time is 11:15.
18     We're going off the record.
19     (Recess at 11:15 a.m. to 11:19 a.m.)
20     THE VIDEOGRAPHER: The time is 11:19. We
21     are back on the record.
22 BY MR. MCLAREN:
23     Q.    Mr. Patel, just a couple more questions.
24 Let me ask you to pull up in your stack Exhibit 8,
25 which is a letter dated September 15th, 2016. You

**65**

1  wrote this with letters -- with assistance from your
2  attorney, right?
3      A.    Yeah.
4      Q.    Look at Paragraph 2, because the last
5  sentence says, quote: In light of the same, we have no
6  choice but to confess judgment. Close quote. Did you
7  write that?
8      A.    My attorney did.
9      Q.    You or your attorney --
10     A.    Yeah.
11     Q.    -- with your attorney's help, correct?
12     A.    Right.
13     Q.    Okay. And then it says, in the next
14 paragraph, quote: We do want to keep you abreast of
15 the fact that we take the position that you have
16 operated in bad faith and contrary to our policy and
17 interest. Close quote.
18     Did you and your attorney write that?
19     A.    My attorney, yeah. Uh-huh, yes.
20     Q.    Okay. And this went to the -- this
21 woman, Beth Levine, who was writing you on behalf of
22 Liberty, right?
23     A.    Yeah.
24     Q.    You don't see anything on here, or you
25 don't recall sending anything like this to St. Paul or

1  Travelers.  Correct?

2        A.        I don't know if my attorney did it or

3  not.  I'm not aware, no.

4        Q.        You didn't?

5        A.        No.

6        Q.        Is that right?

7        A.        No.

8        Q.        Okay.  Were you aware of the policy

9  provision that said you can't confess judgment without

10 notifying St. Paul or Travelers?  Did you even know

11 about that?

12       A.        No.

13                 MR. MCLAREN:  That's all the questions I

14       have.  Thanks very much.

15                 MR. GILREATH:  I've got a couple.

16                 EXAMINATION

17 BY MR. GILREATH:

18       Q.        Mr. Patel, Joel Ammons, he was with the

19 Madison Insurance Group?

20       A.        Yes, he's still with.

21       Q.        With them?

22       A.        Yeah.

23       Q.        Is he who you relied on for your

24 insurance needs?

25       A.        Yeah.  Just whenever I get something like

1  that, call him first and tell him about the accident,

2  even it happened.  Of if I have any question I'll get

3  to him, yes.

4        Q.        Well, before the accident you relied on

5  him to cover you, get you covered for insurance; is

6  that right?

7        A.        Yeah.

8        Q.        He assured you that he could get you

9  fully covered?

10       A.        That was my whole intent when I got

11 insurance, make sure everything is fully covered, yes.

12       Q.        You wanted to make sure you had insurance

13 for your protection?

14       A.        Yes.

15       Q.        And he assured you that he would cover

16 you?

17       A.        Yeah, for -- yeah.

18       Q.        And he was with the Madison Insurance

19 Group, right?

20       A.        Right.

21       Q.        You understood that the insured was the

22 motel.  That's Laxmiji, is that right?  That's who you

23 were covering?

24       A.        Yes, my motel.  Yeah.

25       Q.        Which was owned by the LLC, Laxmiji?

1        A.        Laxmiji, yeah.

2        Q.        Now, Laxmiji is a -- is a corporation you

3  and your wife owned or own?

4        A.        Yes.

5        Q.        That's a source of your income and

6  support?

7        A.        Yes, that's the only source.

8        Q.        Correct.  That's your whole source of

9  income?

10       A.        Yes.

11       Q.        Tell me about your family.  You have a

12 daughter, right?

13       A.        I have two daughters, yes.

14       Q.        Two daughters?

15       A.        Yes.

16       Q.        Are they in school?

17       A.        Yes.  One is in college, one is in high

18 school.

19       Q.        Okay.  The one in college, where is she?

20       A.        At that time she was in high school, I

21 believe, yeah.

22       Q.        Okay.

23       A.        She is in UT right now for the third

24 year.

25       Q.        She is at UT, University of Tennessee?

1        A.        Yes.

2        Q.        Okay.  Who did you buy the hotel from?

3        A.        His name is -- I can't believe I forget

4  the name.  Seaton.  Ken Seton, yeah.

5                 MR. GILREATH:  That's all.  Thank you.

6                 MR. MCLAREN:  No more questions.  Thanks

7        a lot for hosting us.

8                 MR. MURRELL:  You're welcome.

9                 (Proceedings concluded at 11:24 a.m.)

70

```
 1           C E R T I F I C A T E
 2  STATE OF TENNESSEE
 3  COUNTY OF KNOX
 4        I, Rhonda S. Sansom, RPR, CRR, CRC, LCR #685,
 5  licensed court reporter in and for the State of
 6  Tennessee, do hereby certify that the above videotaped
 7  deposition of BHARAT PATEL was reported by me and that
 8  the foregoing 69 pages of the transcript is a true and
 9  accurate record to the best of my knowledge, skills,
10  and ability.
11        I further certify that I am not related
12  to nor an employee of counsel or any of the parties to
13  the action, nor am I in any way financially interested
14  in the outcome of this action.
15        I further certify that I am duly licensed
16  by the Tennessee Board of Court Reporting as a Licensed
17  Court Reporter as evidenced by the LCR number and
18  expiration date following my name below.
19
20
21        _____
          Rhonda S. Sansom, RPR, CRR, CRC
22        Tennessee LCR# 0685
          Expiration Date:  6/30/20
23
          Illinois Licensed Certified
24        Shorthand Reporter
          No. 084.004823
25        Expiration Date:  5/31/19
```

### Exhibits

**Exhibit 1** 31:13

**Exhibit 2** 31:1 37:16

**Exhibit 3** 30:25 31:1,2, 4

**Exhibit 4** 40:1,2

**Exhibit 5** 41:10,11

**Exhibit 6** 42:6,7,8,24

**Exhibit 7** 44:12,15

**Exhibit 8** 45:6,7 64:24

**Exhibit 9** 46:10,11

**Exhibit 10** 48:7,8 51:5 52:12,17

**Exhibit 11** 53:17,19 57:12

**Exhibit 12** 57:9

**Exhibit 13** 58:9,14

**Exhibit 14** 59:22,23 63:21

**Exhibit 15** 60:24 61:3, 4

### $

**$1** 34:10,13,17,23

**$10** 57:2

**$20** 50:6,10 51:8 52:13 53:9,10,12,24 56:20 58:3,21 59:11,14 60:1

**$26,147.20** 49:17

**$5** 37:23 38:2 57:3

**$6** 56:15

**$6,847,791.48** 50:15

### 1

**1** 6:1 9:3 31:13 58:23 63:4,5

**10** 26:8 48:7,8 51:5 52:12,17

**10:46** 50:23,25

**10:51** 50:25 51:1

**11** 53:17,19 57:12

**11:00** 27:22

**11:15** 64:17,19

**11:19** 64:19,20

**12** 21:7 57:9,12

**13** 19:6 58:9,14

**13th** 27:7,8

**14** 21:5,7 59:22,23 63:21

**15** 16:7 60:24 61:3,4

**15th** 24:1,2,3,6,8 25:4 64:25

**18** 35:22

**1982** 13:16

### 2

**2** 6:1 31:1 33:8 35:20 37:16 44:19 45:14 63:12

**20** 16:10,11 53:4

**2012** 19:6

**2013** 19:7 31:10

**2014** 21:6

**2015** 53:13 54:21

**2016** 52:15,21,25 53:21 54:5 58:14 59:1 64:25

**2019** 6:3

**21** 12:24

**22** 12:25 54:5

**25** 31:9,12

**2647** 11:12 42:25 43:2

**28** 58:14 59:1

**2841** 16:5

**2:00** 27:22

### 3

**3** 31:1,2,4

**30** 13:4

**37863** 11:13

**3:00** 27:22

**3:17-CV-00433** 6:7

**3rd** 6:3

### 4

**4** 40:1,2

**4th** 53:21

### 5

**5** 41:10,11

**58** 12:17,18

### 6

**6** 36:11 42:7,8,24

**68** 35:20 36:11

**6th** 52:15,21

### 7

**7** 44:12,15

### 8

**8** 45:6,7 64:24

### 9

**9** 46:10,11

**90** 24:9

**9:53** 6:4

### A

**A-E-M-I-S-H** 20:10,13

**A-M-I-S-H** 20:8

**A-M-M-O-N-S** 38:15

**a.m.** 50:25 64:19

**ab** 58:24

**abandoned** 45:21

**Abingdon** 17:9,10,13

**accident** 33:1 40:23

**accuracy** 32:15

**address** 11:13 16:3 36:24 42:25

**addressed** 42:25 45:15,16

**administrator** 43:4 56:1

**admitting** 44:5,6

**advice** 55:7

**Aemish** 20:6,10

**affidavit** 57:15,24

**agency** 33:4

**agent** 30:10 32:19,22 36:4 37:4 38:9,11 40:20

**agents** 32:11

**agree** 60:12

**agreed** 58:15 60:1

**agreeing** 9:5

**agreement** 7:4 8:17 9:5 54:22 58:12 60:25 61:1

**ahead** 7:19 39:8,25

**ambulance** 21:12 24:15 29:1,6

**Amlodipine** 14:21

**Ammons** 38:15,16 39:22

**amount** 34:19,21 39:19 50:10 51:7 56:25

**amounts** 51:20 52:18

**Amtrust** 32:1 33:5

answering 14:8 15:5

anxiety 14:11

anxious 15:4

anymore 23:1

appearing 8:25

April 6:3 54:5

area 21:22

arrested 12:23

asset 19:3

assign 54:23 60:17

Assignment 62:12 63:4

Associates 6:6

assume 8:3 15:9

Attention 36:24

attorney 9:19,23 10:10 11:2 15:20 34:2 45:10 46:9,13 48:1 51:12,14, 15 52:8,10 53:18 55:6 56:17 58:7,8 59:15 60:3,15 61:11

avoid 33:11

aware 8:24 24:14 37:24 40:13,14 47:1 51:19 52:25 55:2 58:18

**B**

B-E-R-T 42:13

B-H-A-R-A-T 8:9 10:15 31:18

B-H-A-R-T 31:18

back 8:18 21:5 27:5,6, 19,22 28:16,20,23 29:8 38:22 47:8 51:2 61:6 63:20 64:21

background 13:14 17:1

baggage 28:12

Based 44:20

basement 23:1 24:22

basic 17:3

basically 32:21

behalf 43:4 45:17 53:2 62:15,18

Ben 49:8

Benefits 62:12 63:5

Bert 8:7 9:4 25:18

Beth 43:9 45:18

Bharat 6:12,16 8:8 10:14 60:11

bigger 20:23 21:1

bill 38:20 39:6,9

bills 47:9 49:14,18 50:1

bit 13:13 15:17 24:23 47:17

blood 14:19,22 15:2

Bob 42:18

bottom 33:1 35:20 40:4,5 49:14

bought 19:9,25 20:21 23:3

break 7:18,19,21 15:6 50:18,19 64:15

Bristol 13:16 17:10

built 19:24

Burlington 31:23 33:5

business 11:9 15:3 19:15 24:2 45:22 48:14 60:21

buy 19:5

**C**

call 28:7 39:1,3,4 40:20

called 20:6 24:14 38:25 39:7 40:20 41:4 46:15 48:24 62:2

calling 39:5

caps 56:4

carbon 21:10,14,18 23:19 24:6,7,18 40:23

care 39:6 62:23,25

carefully 32:14,18

carrier 29:20 34:13 43:6

carry 35:7

case 6:7,9 7:5 40:8 47:5 59:5 61:1

cellphone 39:16

change 43:24

Charles 16:5

checked 23:21 26:24

checking 27:11

choice 45:22

claim 36:23 40:14 50:5 53:9 63:4

claiming 51:21

claims 36:25 43:3,4 55:5 60:10

clear 24:4

clerk 24:14

client 59:5

clients 54:3,23 55:1

close 23:11 40:8 41:18 44:22 55:1,13

closed 23:13,15

collect 57:6

college 17:3,8,10,13

commercial 31:23 36:13

committed 36:21

communications 64:10

community 17:10,13

companies 36:24 37:13 40:22 54:24 60:18

company 6:11,21 34:12,17 35:12,14 36:5 37:8,10 38:6 40:18,21 41:5,18,22 43:5 45:21 55:16

Complaint 31:16,17 47:19,25

Complaints 40:6 48:14

complete 55:11

completely 23:19 58:6

confess 45:23

Connecticut 36:25

consent 53:24 54:21 59:21 60:1 63:21 64:1, 4,7,11

constructively 45:21

contest 13:3

continuing 55:10

conversation 27:2,20

conversations 51:20

convicted 13:2

copied 47:4

copies 55:11

copy 9:11 30:23 35:6 61:2,6,10,11 62:21

corporation 11:10,24, 25 12:1 18:15,20,21,23 20:5

correct 7:6,16 9:24 30:5 43:20 56:1

correctly 8:13

couple 12:17 17:3,11 64:23

court 6:8,14 25:23 49:3,6 51:12 61:2

courtroom 49:9

cover 40:22

coverage 33:12 34:4, 7,9 40:15,19 42:24 43:11,25 44:4,6,7,21 47:1,5 55:12,16,21

covered 32:22,25 33:24 36:22

Crossing 11:16,17,19

cut 22:14,16

cut-off 22:14

**D**

**damages** 36:21 48:5, 25 49:2 50:5,9 51:5,9 52:12,17,19 53:2 57:14 58:17 59:20,21 63:22

**Darlene** 32:9

**date** 19:7,8 52:15,20, 22

**dated** 64:25

**day** 7:12 16:21 17:25 27:18 38:22 59:18,20

**days** 16:19 26:8 41:9

**deal** 38:11 60:16

**deals** 62:3

**decide** 11:2 20:18

**decided** 14:2

**declarations** 34:3

**declared** 58:23

**default** 54:4,9,12,14 57:14,20 58:16 59:19

**defendant** 10:22

**defense** 40:8 46:19

**denial** 46:20 47:1

**denied** 40:14

**deny** 46:19

**denying** 40:19 55:12, 16,21

**department** 22:18 23:13,14 24:17 26:20

**deposition** 6:5,12,24 8:11,18,20,25 9:2 15:13

**depositions** 48:4

**desk** 24:14

**died** 19:22

**directly** 46:14

**disclaimer** 42:24

**discuss** 15:21

**discussed** 15:17 34:20 35:1 36:17 53:23 55:6 56:10,12 60:3,20

**discussion** 52:18 56:19

**discussions** 53:1 54:20 55:3 56:4,9 57:1, 4 59:10

**dismissal** 60:10

**District** 6:8

**doctor** 14:18 39:9

**document** 43:12 62:2 63:5

**documents** 9:11 15:24

**dollar** 51:20

**Dollywood** 24:11,12

**door** 24:22

**doors** 23:17

**draft** 45:10

**drafted** 45:11

**drinking** 13:6

**drive** 16:9

**DUI** 12:25 13:2

**duly** 6:17

**duties** 16:18

**E**

**easier** 25:22 42:19

**Eastern** 6:8

**easy** 27:6 42:16

**educational** 17:1

**effects** 24:1,6

**emailed** 14:1

**ending** 53:13

**ends** 16:21

**engaged** 54:20

**enter** 64:1,4

**entered** 54:22 58:18 60:15

**equipment** 23:20 25:13

**estimate** 27:25

**et al** 6:10

**evacuate** 24:8

**event** 21:20

**evidence** 63:17

**EXAMINATION** 6:18

**excess** 30:4 36:24

**exchange** 54:24

**execute** 54:25

**executed** 62:22

**exhibit** 6:1 30:25 31:1, 2,4,13 37:16 40:1,2 41:10,11 42:6,8,24 44:12,15 45:6,7 46:8, 10,11 48:7,8 51:5 52:12,17 53:17,19 57:9,12 58:9,14 59:22, 23 60:24 61:3,4 63:21 64:24

**expenses** 38:23

**expired** 32:16

**F**

**fact** 41:22

**fast** 13:7

**February** 21:5 24:1,2 25:4

**feel** 15:5

**feeling** 24:6

**feels** 16:25

**figure** 41:1

**figured** 24:17

**file** 9:13 32:15

**filed** 6:7

**find** 13:23 64:13,15

**fine** 7:7 9:7 25:14

**finish** 25:19

**fire** 6:10 22:18 23:13, 14 24:17 25:7 26:19 35:11,14

**five-minutes'** 16:9

**fix** 22:23

**fixed** 16:24

**folded** 35:23 36:1,12

**Forge** 11:12 13:17,23 16:6 30:17

**forget** 38:2

**form** 7:5

**formality** 10:13

**forward** 9:6 14:3

**fourth** 57:15

**Friday** 27:9,10

**friend** 13:18,25

**Fritz** 6:10 17:12 18:5 24:4 26:11,25 34:9 49:14 50:14 56:14 61:7 62:5

**Fritzes** 9:24 17:20 18:3 23:25 26:10 34:13 39:7 43:23 48:11 50:5,9 51:20 53:2

**Fritzes'** 38:23 47:9 48:4 51:14 52:8

**front** 28:13 34:2 62:6

**fully** 62:21

**furnish** 11:1,3 34:2

**future** 59:11

**G**

**G-I-L-E-S** 32:10

**gas** 23:15 24:22,25 25:8,11

**gave** 26:23 28:20 55:7

**general** 32:1

**Giles** 32:10

**Gilreath** 7:8 9:23 10:3 18:8 45:15 51:13,24 53:18 54:20 56:4 64:6

**give** 27:6,14 38:19 44:3

**giving** 47:5

**good** 8:5,14 9:15 10:12 15:11 38:20

**Gotcha** 9:10

**Governor's** 11:15,17, 19

**ground** 19:19,23 20:20

**Group** 31:7 38:9 64:11

**guess** 9:5,25 12:3 15:1 43:8

**guessing** 28:22

**guy** 31:19 42:20

**guys** 53:23

---

**H**

**hand** 7:19 30:23 35:5 39:2,21 42:5 48:3,14 53:16 57:11 61:2

**handle** 41:25 59:15 60:7

**handled** 30:8

**happen** 10:19,25 38:8

**happened** 7:24,25 23:12 24:9 27:9 28:19 37:6 47:18 49:4 58:2

**hard** 14:24

**Hartford** 36:25

**hear** 43:17

**heard** 34:16 38:5

**hearing** 34:23 49:1

**heat** 23:6

**heater** 22:14,22,25 23:6 24:25

**heating** 22:4,5,7

**heavy** 35:7

**helped** 45:10,12

**helps** 16:16

**Hey** 14:1 39:8

**high** 17:2,4

**hire** 38:8

**home** 24:14

**honest** 46:2

**honestly** 10:20 28:5 29:24

**Hooper** 49:8 57:13

**hope** 12:22

**hospital** 26:13 27:13, 19,21 28:25 39:5

**hot** 25:14

**hotel** 7:13 10:19 11:5, 6,22,23 12:2,16 13:18, 20,25 16:8,16,18 17:23 18:21 19:5,10,12,24 21:3,13,17,21 23:9,11, 18 24:8 25:14 26:11 29:14,17 30:21

**hotels** 12:14 18:18,24 20:19

**hour** 23:18,23 26:12

**house** 16:15 18:20,22

**housekeepers** 16:20

**huh-uh** 35:18 44:11

---

**I**

**idea** 17:14 18:1 29:16 37:20 38:4 42:2

**identified** 8:6

**identify** 35:21

**immediately** 40:6

**impair** 14:8

**incident** 7:12 21:8 40:19

**indemnification** 46:20

**India** 12:10 13:15

**individual** 56:11

**individually** 62:14

**indoor** 12:19

**inform** 44:21

**information** 11:2

**initio** 58:24

**Inn** 11:9 13:21 19:11 20:24

**installed** 26:9

**insurance** 6:11,21 29:17,22 30:1,2,8,12, 19 31:7,22,23 32:2,4 33:12,18,22 34:12,17 35:12,14 37:8 38:9,18 40:18 41:5,18,22 43:5 46:19 54:24 55:4,11,15 60:17 64:11

**insured** 36:22

**insurer** 40:7,13 55:12

**intend** 7:23

**interchangeably** 6:23 35:13

**interest** 34:14

**interested** 8:19

**interfere** 14:9

**International** 32:1

**interruption** 39:16

**investigate** 21:14

**involved** 10:16 21:21

**involving** 56:20

**issued** 49:2

---

**J**

**J-A-G-R-U-T-I** 8:12

**Jagruti** 8:11 9:4 16:12 60:11

**January** 52:15,21,25

**Jeff** 41:1 51:18 55:6 58:20 61:14

**Jessica** 6:10 18:5 49:14 61:7 62:5

**job** 16:20

**Joel** 38:10,11 39:23,24 41:10

**Johnson** 6:6

**judge** 7:5 49:1,8 57:12

**judgment** 45:23 48:5, 24 49:2,13 51:5,8 52:12,17 53:5,8,10,14, 25 54:4,9,12,15,22,25 56:20,21,24 57:14,20 58:4,16,21,22 59:1,9, 11,20,21 60:2 63:21 64:1,4,8,11

---

**K**

**kind** 19:1 21:16,22 35:2

**knew** 29:10 39:3 47:5 52:11 53:4 64:7

**knowledge** 9:2 10:24 22:12 32:7 37:11 40:9 42:3 43:23 55:14

**Knoxville** 6:9 30:10

---

**L**

**L-A-X-M-I-J-I** 18:14

**lady** 27:4

**language** 37:1

**lawsuit** 10:17 13:10 17:19 18:2 47:18,20, 24,25 48:15 49:22,24 51:7 60:17 62:4

**lawyer** 15:19

**lawyers** 7:3

**Laxmiji** 11:10,23,24 12:7,14 18:13 20:2 44:17 54:22 57:7 60:1 62:15,18 63:13

**leak** 21:14,22 23:16

**learn** 34:1 51:5,6

**learned** 13:7

**lease** 19:16,19,23

**leased** 19:14 20:20

**leave** 28:10,24

**leaving** 58:6

**left** 24:10 28:15

**Lemon** 19:21

**lesson** 13:7

**letter** 30:23 31:7,9,18, 21 32:9 39:21 41:9,14 42:6,12 43:15 44:14,15 45:2,9,25 46:4,9,13,20 49:19,22,24 52:1,23 53:9,17 54:3,14 55:12, 15,18,20 61:1 64:13,25

**letters** 45:17 47:4 55:23,25

**letting** 64:5

**Levine** 43:10 45:18

**liability** 32:1 36:14

**Liberty** 29:20,21 33:22 34:3,9,12,17,24 41:3 43:5,6,10,22 44:3 45:18,20 46:14 55:15 56:1 63:9,17

**Liberty's** 56:1

**light** 45:22

**likewise** 58:23

**limit** 33:21

**limits** 33:23 37:18

**lisinopril** 14:22,23

**list** 50:9

**listed** 12:5 39:14

**lists** 49:13

**live** 16:2 17:9

**LLC** 11:10 20:6 54:22

**long** 7:23 12:24 13:17 26:6 28:11 42:11

**loss** 36:13 37:2,12

**lot** 24:20 28:9 32:20,21 42:18

**lots** 45:12

**Lucy** 19:21

**luggage** 28:19

---

## M

**M-E-R-I-N** 46:16

**mad** 26:18 28:2

**made** 9:3 25:11 31:1 40:14 56:20 60:25

**Madison** 31:7 38:8 64:10

**mail** 48:16,17,20 51:10

**main** 41:5 43:6

**maintain** 50:9

**make** 14:4 16:20 23:16,22 24:23 27:6 32:22 41:10 59:10,14

**Marine** 6:11 35:12,14

**mark** 39:25 53:17 61:3

**marked** 6:1 31:4 37:15 40:2 41:11 42:6,8 44:12 45:7 46:11 48:4, 8 53:19 57:9,11 58:9, 13 59:23 61:4 63:5

**marking** 59:22

**matter** 10:9 27:6 44:22 49:6

**Mcgowan** 36:5 38:5

**Mclaren** 6:19,20 7:3,9, 10 8:23 9:3,10,13,17, 18 20:14,17 25:25 26:4,5 30:25 31:5,13, 15 35:5,10 37:15,17 39:17,18,25 40:3 41:8, 12 42:5,10 43:14,21 44:13 45:5,8,16,19 46:12 47:21,23 48:6,9 50:19,22 51:3 53:16,20 55:24 57:10 58:10 59:24 60:24 61:5 62:23,25 63:3 64:13,22

**meaning** 12:6

**means** 56:6 63:18

**medical** 38:23 47:9 49:13

**medication** 14:5,6,7 15:2

**medicine** 14:11,13,18, 20

**meet** 38:17

**meeting** 60:14

**members** 18:13

**Merin** 46:15

**met** 9:25 10:2 18:3,6,8

**microphone** 47:22

**middle** 54:18

**MIG** 30:10,24 31:6 32:11 33:5 38:8

**Mike** 6:20

**miles** 11:20,21

**million** 34:10,14,18,23 37:23 38:2,3,4 50:6,10 51:8 52:13 53:5,9,10, 12,24 56:15,20 57:2,3 58:3,22 59:11,14 60:2

**mind** 31:14

**minute** 31:2 39:2 63:21

**minutes** 11:14 16:10, 11

**misunderstandings** 33:11

**moment** 28:18

**money** 26:23 27:5 28:20 33:23 34:25 35:3 43:23 44:4,6,7 52:1 55:3 57:6

**monoxide** 21:10,14,18 23:19 24:6,7,18 40:23

**morning** 24:1,5 27:10

**MORRELL** 8:24 62:24 63:2

**mortgage** 19:17

**motion** 57:13,20 58:3

**Mountain** 11:9 13:19

**move** 28:13

**moved** 13:17

**moving** 14:3

**mumbling** 43:20

**Murrell** 6:6 7:7 9:7,12, 15,19 10:9 20:13 25:18,19,22 35:8 39:22 40:4,12 41:1,9,13,16, 17,23 43:17 46:18,25 47:3 48:21 49:11 51:17 52:3 53:22 54:2,19 55:7,9,22 56:3 62:20

**Mutual** 55:15

---

## N

**named** 49:8

**names** 6:22 14:14

**needed** 27:5

**negotiations** 59:14

**nicer** 21:3

**night** 11:16 24:2 25:3 27:5

**nights** 27:6,16,17

**Nos** 6:1

**notary** 62:6

**notice** 8:10 9:3,8 15:13 21:9,17,19 54:3

**noticed** 8:10,25 9:2,4 23:25

**notifying** 64:5

**November** 31:9 58:14 59:1

**null** 58:23

**number** 31:11 39:7 63:16,17

---

## O

**objections** 7:4

---

**occur** 22:11

**occurred** 7:12 21:21

**occurrence** 36:20

**odds** 16:21

**office** 24:25 25:1 26:14,15,19 28:7,14 30:20 60:19

**open** 12:13 23:18,22 24:2,12 25:1 26:19,21 28:7

**opened** 23:17,21,23 24:22

**option** 25:12 60:23

**order** 15:25 33:10 59:18

**original** 31:16,17 61:25

**owe** 43:24 55:3

**owned** 13:25 19:15

**owner** 11:25 20:1

**owners** 18:13,14 63:13

**owns** 12:1

**P**

**P-A-T-E-L** 10:15

**pages** 32:20 62:4

**paid** 34:13,17,21 38:25 39:14,15 43:22 44:4 47:11 50:2

**pain** 50:15 56:5,15

**paper** 10:8 15:25 33:14 36:1 47:14 50:11 52:1 63:22

**papers** 32:16

**paragraph** 32:14 33:8 40:5 43:11 44:19 45:14 46:17 54:18 63:12

**Parkway** 11:12 43:1

**part** 51:19

**participate** 53:1

**partner** 19:24,25

**partner's** 20:15

**partners** 13:18

**partnership** 14:2

**pass** 58:13

**past** 11:18,19 49:13

**Patel** 6:13,16,20 8:7,8, 9,11,24 10:14,15 31:6 35:5 51:4 60:11,12 64:23

**Patels** 34:13 63:13

**Paul** 6:10,21 30:5 32:4 33:6 35:11,14 40:10 42:2 43:16 45:3,25 46:5,22 59:5 63:25 64:3,7

**pay** 38:23 39:9 47:9

**paying** 19:19,20,22 44:6

**payment** 47:8

**pending** 7:20

**people** 15:1 23:15 24:10,20 25:8,11 28:9 39:5

**percent** 24:9

**permission** 63:25

**personally** 10:8

**phone** 39:7

**piece** 36:1 63:22

**pieces** 15:24

**Pigeon** 11:12 13:17,23 16:5 30:17

**place** 16:5 21:8 62:8

**plaintiff** 10:22

**plaintiffs** 60:25

**plead** 13:3

**pleading** 57:12 59:4

**pleadings** 57:21

**pocket** 47:10

**point** 61:18

**policies** 30:14 31:22 33:18 55:11

**policy** 29:21 30:4,5,18 31:1,24 32:2,5,14,16, 18 33:10,22 34:3,10 35:6,9,13 36:9,14,22 37:19 44:22 63:16 64:3

**pool** 12:19 21:22 22:4, 8 23:7,10 25:1,5 26:7

**portion** 47:10

**position** 43:24

**potential** 40:14

**prejudice** 60:10

**prepare** 15:12,16,25 31:16

**pressure** 14:19,22 15:2

**pretty** 26:18

**previously** 40:13 48:4

**price** 38:20

**primary** 29:20 34:13

**prior** 21:9,16,19 47:4 60:15 63:22

**problem** 21:10,17 22:7,9,11 24:23 25:16

**problems** 15:5 47:22

**process** 48:13

**pronounce** 14:15 42:16

**pronouncing** 8:12 16:13

**properly** 14:15

**properties** 18:17,19 19:1

**property** 19:14,18 31:23

**Propoint** 43:3 44:16 46:14 56:1

**provide** 40:7

**provided** 9:8,9 55:10

**pull** 64:24

**pursue** 55:4

**put** 20:16 22:25 23:4 25:9,12

**Q**

**question** 7:20,21 8:4 25:19 33:16 38:23 44:23 45:24 49:3 50:17 52:25 63:9

**questions** 7:2,11,15, 24 12:21 14:4,8 15:5 64:14,23

**quote** 40:5,8,13 41:16, 17,19 44:20,22 46:18 54:3,18 55:1,9,13 60:10

**quotes** 41:17

**quoting** 33:9 36:12 54:17

**R**

**Rachel** 46:15

**raise** 7:19

**reached** 58:12

**read** 32:21 33:10,18 35:16 36:8,15 37:1 42:12 48:25 55:10

**reading** 54:17 58:22

**ready** 23:18

**realize** 15:13

**realized** 22:22

**reason** 26:21 28:23 62:1

**recall** 10:21 54:19

**received** 34:23 35:2 41:18

**recess** 50:25 64:19

**recognized** 28:6

**recognizing** 17:18

**recommended** 14:18 60:22

**record** 6:3 50:24 51:2
62:21 64:18,21

**redo** 25:10

**referenced** 55:23

**referred** 46:20

**referring** 45:20 55:14

**refers** 55:18

**refund** 28:20

**refunds** 27:14

**regard** 54:21

**region** 12:8,9

**regretfully** 44:21

**regular** 48:20

**related** 32:16

**relationship** 33:5

**Release** 62:2

**released** 39:8

**releasing** 62:3

**religion** 20:11,12

**remember** 10:25
22:17 25:25 26:7 28:2
35:11 48:11

**rent** 25:2

**rented** 25:3

**reopened** 26:6

**repeat** 50:7

**report** 36:23 37:8,9

**reported** 37:2,4,12

**reporter** 6:14 25:23
61:2

**represent** 6:21 35:11

**request** 46:19

**required** 36:23

**reserve** 7:4

**responded** 41:23

**responders** 21:13

**response** 41:18

**result** 36:21 58:3

**review** 15:24 32:14,17
44:20

**reviews** 43:12

**rights** 54:23 60:17

**room** 24:19 25:2 26:23
28:13,16,21

**rooms** 12:16,17,18
20:25 21:1 24:13 25:3

**round** 9:13

**Royal** 13:21 19:11
20:24

**rushed** 24:16

**S**

**sat** 60:19

**Saturday** 27:9,10,12

**schedule** 16:24

**school** 17:2,4

**scope** 33:11

**seal** 25:9

**searched** 23:16

**sell** 20:21

**send** 30:14 45:24

**sending** 31:22

**separate** 30:20 55:23

**September** 64:25

**series** 46:9

**served** 54:11

**server** 48:13

**Service** 43:4

**set** 57:13 58:3,23 59:9

**setting** 58:16 59:19

**settled** 50:12

**Settlement** 62:3

**Sevierville** 6:6 13:24

**sheriff** 48:13

**short** 15:13

**shorten** 42:15

**show** 47:14 61:22

**showers** 25:15

**shut** 23:19 24:22 25:5
26:21 28:10

**side** 10:6

**sign** 55:4 61:15 62:9,
15

**signature** 57:16,18
62:14

**signed** 57:16,24 58:1,
14 61:7,12,18,22,24
62:5,17

**simple** 33:16

**sir** 9:17 16:4 37:22

**sit** 42:1 46:21 57:22
59:3 63:20,24

**sold** 13:19

**sole** 18:13,14

**somebody's** 10:22

**son's** 20:15

**sound** 34:10

**Speak** 43:17

**Specialty** 36:13

**spell** 8:7 10:13 20:7

**spelled** 31:18

**spelling** 10:14 42:13

**St** 6:10,21 16:5 30:5
32:4 33:6 35:11,14
37:12 40:10 42:2 43:16
45:3,25 46:5,22 59:5
63:25 64:3,7

**stack** 64:24

**start** 58:15

**started** 14:10,17

**starts** 42:23,24

**state** 10:13

**States** 6:8

**stay** 26:17

**stayed** 11:15 17:22
18:1 22:19 29:13

**staying** 27:10

**Stick** 24:22

**stopped** 13:6 23:4

**street** 13:22 19:11

**stressed** 15:4

**strongly** 33:9

**stuff** 26:16,22 28:12,17
60:8

**subpoena** 9:1

**sued** 10:22,23 11:1
48:11

**suffered** 50:9

**suffering** 50:15 56:5,
15

**Suggs** 10:5 18:10
52:4,6

**suing** 11:1 53:12

**suites** 21:1

**summer** 54:21

**Summons** 40:6 47:19,
24

**Sunday** 27:11

**supposed** 26:17

**Surplus** 43:5,6

**surprised** 56:14,16

**suspect** 45:10

**swear** 6:14

**swimming** 12:19

**switch** 20:18

**sworn** 6:17

**system** 22:4,5,7

**T**

**table** 15:1

**taking** 8:17,19 14:5,6,7

15:2

**talk** 22:3,5 26:10 29:5
47:17 51:22,24,25 52:3

**talked** 38:10 40:25
52:9 53:22,24 54:1,5
58:20

**talking** 37:21 51:4
52:10

**telling** 38:11 40:22
43:10

**temperature** 22:15

**tender** 40:6

**Tennessee** 6:7,9
11:13 16:6 30:16 56:5

**testified** 6:17 49:1

**testimony** 34:8 57:22

**thing** 22:19 24:9,15
27:9 37:7 42:22 52:11
56:21

**things** 44:5

**time** 6:4,25 7:18 9:25
10:2 12:24 13:1,17
18:9 20:21 21:12,15
22:13,15 26:2 27:24
33:15 34:22 36:8 39:13
42:13 46:14 50:23 51:1
53:14 60:15 64:17,20

**times** 32:21

**today** 6:3 13:11 14:3
36:15,18 42:1 46:21
57:22 59:3 63:20,24

**told** 22:16,17 23:23
25:8 26:19,20 28:8,10
32:6,25 33:2 38:18
56:11

**top** 32:25

**total** 12:18 50:6

**Travelers** 6:21 35:12
36:24 37:3,13 40:10
42:2 43:16 45:3,25
46:5,22 59:5 63:17,25
64:3,7

**Travis** 6:9 18:5 50:14
56:14 61:7 62:5

**trial** 38:19

**true** 54:6

**turn** 36:11 47:25

**turned** 48:21 51:16

---

**U**

**U.S.** 13:16 17:5,6

**uh-huh** 8:1 9:22 10:4
12:20 27:15 30:15
35:15 36:7 44:18 51:18
61:9

**umbrella** 30:4 32:5
36:14 37:21

**understand** 7:15 8:2
28:1 44:1

**understanding** 58:25

**understood** 8:4

**undoing** 59:19

**unhappy** 28:6

**United** 6:8

**urge** 33:9,10

---

**V**

**Valentine's** 7:12

**verify** 32:15

**versus** 6:10

**video** 6:12

**Virginia** 17:9

**Vista** 11:9 13:19 20:23

**void** 58:24

**voluntarily** 9:1

---

**W**

**wait** 39:2

**wanted** 20:16 23:22
26:22

**water** 22:14,22,24
23:6,7,9 24:25 25:14

**Wednesday** 6:3

**week** 14:17 26:8 34:8

**wife** 8:15 11:25 12:12
15:22 16:13 18:12,16
20:1,4 44:17 60:11,21

**wife's** 8:19

**woke** 24:5

**woman** 45:16 46:15

**work** 16:15

**writing** 45:17 46:18

**wrote** 43:9

---

**Y**

**year** 53:13

**years** 13:4 17:3,11
34:6 38:2

**young** 12:24 13:16