UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| TRAVIS AND JESSICA FRITZ, as Third-Party Beneficiaries of LAXMIJI, LLC individually and LAXMIJI, LLC d/b/a MOUNTAIN VISTA INN & SUITES, BHARAT PATEL individually and BHARAT PATEL d/b/a MOUNTAIN VISTA INN & SUITES, and JAGRUTI PATEL, <br><br> Plaintiffs, <br><br> v. <br><br> ST. PAUL FIRE AND MARINE INSURANCE COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) No.: 3:17-cv-433-TAV-HBG ) ) ) ) ) ) |

**MEMORANDUM OPINION AND ORDER**

This civil action is before the Court on plaintiffs' motion for partial summary judgment [Doc. 72] and defendant's motion for summary judgment [Doc. 74]. Defendant responded in opposition to plaintiffs' motion [Doc. 82], and plaintiffs replied [Doc. 86]. Plaintiffs in turn responded to defendant's motion [Doc. 78], to which defendant replied [Docs. 87]. For the reasons that follow, the Court will deny plaintiffs' partial motion for summary judgment and grant defendant's motion for summary judgment.

**I.     Background**

This is a breach of contract case between an insurer and the third-party beneficiaries of its insured. The case arises out of an alleged carbon monoxide poisoning that took place on February 15, 2014, at Laxmiji LLC, d/b/a/ the Mountain Vista Inn and Suites ("Laxmiji" or

"the hotel") in Pigeon Forge, Tennessee [Doc. 25]. Plaintiffs Jessica and Travis Fritz ("the Fritzes") were staying at the hotel when they sustained serious and permanent injuries allegedly caused by a malfunctioning pool heating and ventilation system, which emitted carbon monoxide that poisoned plaintiffs as they slept [Doc. 80].

The Fritzes thereafter filed a lawsuit ("the Underlying Lawsuit") on December 23, 2014, in the Circuit Court for Sevier County, Tennessee, against Laxmiji and its owners, Bharat Patel and Jagruti Patel ("the Patels") [*Id.*]. A $20 million Consent Judgment was later entered in that case [Doc. 76-19]. This current case was filed against defendant St. Paul Fire and Marine Insurance Company ("St. Paul") by the Fritzes, as third-party beneficiaries of Laxmiji, for recovery of damages for breach of contract [Doc. 25].

### A.    The Insurance Policies

At the time of the carbon monoxide incident, Laxmiji had two insurance policies. The first, an underlying commercial general-liability policy ("the Underlying Policy"), was issued by Liberty Surplus Insurance Corp. ("Liberty") with limits of $1 million [Doc. 80]. The second, an umbrella, or excess, insurance program ("the Umbrella Policy") was issued by St. Paul for members of Community Associations PG, Inc. ("the Program") [*Id.*]. This Umbrella Policy had a $5-million-per-occurrence limit and was meant to provide coverage to Laxmiji once the Underlying Policy was exhausted [*Id.*].

Laxmiji worked with Madison Insurance Group ("MIG") to gain access to the Program [Doc. 80]. The parties disagree about MIG's relationship to The Travelers Companies ("Travelers") and St. Paul, its wholly-owned subsidiary, during this transaction. St. Paul states that MIG was not its agent for the Program [Doc. 75], while plaintiffs argue that MIG was an

2

actual agent of St. Paul by virtue of a written agreement, operation of statute, and principles of apparent authority [Doc. 78]. The parties also disagree whether MIG used an intermediary to solicit an application for Laximiji to become part of the Program and therefore gain access to the Umbrella Policy. St. Paul maintains that MIG used Appalachian Underwriters, Inc. ("Appalachian"), a wholesale broker, to obtain a quote from McGowan Program Administrators ("McGowan"), the sole administrator of the Program. Plaintiffs state, instead, that although McGowan was *an* administrator of the Program, its agency agreement with Travelers was not the only agreement governing all agency relationships relative to the Program. Rather, plaintiffs maintain that Travelers utilized both McGowan and MIG as agents in connection to the Program [Doc. 80], and that Laxmiji accessed the Umbrella Policy through MIG, not McGowan.

The Umbrella Policy was delivered to the Patels in Tennessee [Doc. 80]. It identified McGowan as the agent, and the Evidence of Insurance identified Appalachian as the producer [Doc. 76-1]. MIG is not identified as a producer or agent in either the Umbrella Policy or the Evidence of Insurance.

The Umbrella Policy establishes that St. Paul would cover Laxmiji only after the Underlying Policy limits were exhausted. The Policy states that St. Paul would pay on behalf of "the Insured all sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law" [*Id.*]. As applicable here, the "Retained Limit" is "the total of the applicable limits of all Scheduled Underlying Insurance . . . for Bodily Injury . . . covered by such Scheduled Underlying Insurance" [*Id.*]. In this instance, Laxmiji's $1 million policy with Liberty is the Underlying Insurance, thus, by

3

the Umbrella Policy's terms, St. Paul would cover Laxmiji's damages payments once its policy limits under Liberty were reached.

With respect St. Paul's duty to defend, the Umbrella Policy specifies:

A. We shall have the right and duty to assume control of the defense of any Claim or Suit seeking damages covered by this policy, and we shall have the right to investigate and settle such Claim or Suit, when the Retained Limit has been exhausted by payment of judgments or settlements that would be covered by this policy. These rights and duties apply even if the Claim or Suit is groundless, false or fraudulent.
B. Prior to the exhaustion of the Retained Limit we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any Claim or Suit seeking damages that would be covered by this policy. This right includes the opportunity to participate in the defense of any Claim or Suit that may result in damages covered by this policy. If we exercise this right, we will do so at our own expense.
C. We have no duty to defend, investigate or settle any Claim or Suit seeking damages not covered by this policy.

[*Id.*]. The Umbrella Policy therefore makes clear that St. Paul's duty to defend arises only with respect to damages covered by the Policy and only after an Underlying Policy's limit was reached, in this case $1 million. Before that limit was reached, however, St. Paul only had a right, not a duty, to participate in any settlement or defense of a claim.

Apart from St. Paul's duty to defend, the Umbrella Policy also contains a "Cooperation" clause, which contains requirements for the insured resulting from an Occurrence[1], Claim or Suit:

F. Duties in the Event of an Occurrence, Claim or Suit

---

[1] "Occurrence" is defined in relevant part, "as respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in Bodily Injury or Property Damage. All Bodily Injury or Property Damage caused by such exposure to substantially the same general harmful conditions shall be considered to be caused by one occurrence" [Doc. 76-1].

4

1. You must see to it that we are notified as soon as practicable of any Occurrence which may result in a Claim or Suit seeking damages covered by this policy . . . .
2. If a Claim is made or Suit is brought against any Insured that is reasonably likely to involve the coverage provided by this policy, you must notify us in writing as soon as practicable. You and any other involved Insured also must:
   a. immediately send us copies of any demands, notices, summonses or legal papers received in connection the Claim or Suit . . . .

[*Id.*]. This section also contains a "Voluntary Payments" clause, which states:

3. No Insured will, except at that Insured's own expense, voluntarily make a payment, assume any obligation, make any admission, or incur any expense, other than for first aid for Bodily Injury covered by this policy, without our consent.

[*Id.*]. Further, a "Notice Requirement" for the insured states:

What To Do If You Have A Loss – Specialty Commercial Umbrella Liability Policy

When an Occurrence happens, or is committed that will likely result in damages that are covered by this policy, you or any Insured covered under this policy are required to report the claim to:
  The Travelers Companies, Inc.
  Attn: Excess Claims
  One Tower Square, Mail Code 000-MS07A
  Hartford, Ct 06183

[*Id.*].

The Policy specifies that it can only be changed with the knowledge and written approval of St. Paul:

E. Changes
  Notice to any agent or knowledge possessed by any agent or any other person will not effect a waiver of, or a change in, any part of this policy. This policy can only be changed by a written endorsement that becomes a part of this policy and that is singed by one of our authorized representatives.

[*Id.*].

5

Finally, the Policy contains a "No Action" provision, which states that no person or organization can bring suit against St. Paul unless the insured has "complied with all the terms of this policy" and "the amount [owed] has been determined with [St. Paul's] consent or by actual trial and final judgment" [*Id.*].

**B.    The Underlying Lawsuit**

On February 15, 2014, plaintiffs Jessica and Travis Fritz were staying at the hotel when they suffered injuries allegedly resulting from carbon monoxide poisoning [Doc. 1-1]. The Fritzes initially filed a lawsuit on December 23, 2014, in the Circuit Court of Sevier County, to recover damages from Laxmiji and the Patels [Doc. 76-5]. The defendants never filed an answer. They did, however, forward information of the lawsuit to MIG, who subsequently sent a letter to ProPoint Claims Services, LLC ("ProPoint"), Liberty's claims administrator [Doc. 76-6]. On May 27, 2014, ProPoint emailed Laxmiji disclaiming Liberty's coverage [Doc. 76-7].

The attorney for Laxmiji and the Patels then sent two letters to MIG, dated January 14, 2015, and January 23, 2015, reiterating that Liberty should cover the Fritzes' claim, and enclosing the summons, complaint, and the Fritzes' interrogatories, request for production, and request for admissions [Doc. 76-8]. ProPoint again sent a letter to Laxmiji stating that Liberty would not cover the claim [Doc. 76-9].

On October 16, 2015, the state court granted the Fritzes' motion for Default Judgment and thereafter scheduled a writ of inquiry hearing on damages [Doc. 25]. Laxmiji and the Patels were sent the Default Order and notice of the Writ of Inquiry. On the date of the Writ of Inquiry, the defendants again did not appear, and the Fritzes presented evidence of their

6

damages but were not cross-examined [*Id.*]. The court thereafter granted the Fritzes' demand for judgment and entered a judgment for damages for $20 million. This judgment was served on the Patels and Laxmiji, who later moved to set aside the judgment [*Id.*].

Following this judgment, Laxmiji once again contacted ProPoint, and Liberty once again declined coverage [Docs. 76-16, 76-17]. In the meantime, the Fritzes and the Patels entered into a Release and Settlement, whereby the Patels were dismissed personally from the litigation [Doc. 76-15]. The parties also agreed to an Assignment of Claim to Benefits, wherein Laxmiji and the Patels assigned their rights under both insurance policies to the Fritzes with the agreement that the Fritzes would not execute them against Laxmiji so long as a suit against Liberty and St. Paul was not procedurally barred [*Id.*]. Following these agreements, the Default Judgment and Judgment for damages were set aside, and a $20 million Consent Judgment was entered in the Underlying Lawsuit [Docs. 76-18, 76-19]. The Fritzes then filed this present lawsuit, as third-party beneficiaries of Laxmiji and the Patels, against Liberty and St. Paul to collect the Consent Judgment. Liberty has since been dismissed from the case [Doc. 35]; therefore, the only issue before the Court is the breach of contract claim against St. Paul.

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to

7

the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

In a case such as this one, where parties have filed competing motions for summary judgment, each party, as movant, must establish that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. When evaluating cross-motions for summary judgment the Court should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). If the Court finds that one party has failed meet its burden, the other party is not considered to have automatically met theirs. Rather, the Court must evaluate each party's motions individually to determine if they have complied with Rule 56. "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to the resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). If the Court determines that a

genuine issue of material fact exists, both motions must be denied. In the alternative, if the Court finds that no genuine issue of material fact exists and a party is entitled to prevail as a matter of law, the Court will render judgment. *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 732 (S.D. Ohio 2006).

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### III. Analysis

Plaintiffs bring a breach of contract claim against St. Paul, alleging that St. Paul disclaimed coverage under Liberty's Underlying Policy, thereby breaching the Underlying Policy [Doc. 25 ¶ 64]. Plaintiffs also allege that St. Paul failed to satisfy its obligations to Laxmiji pursuant to the Umbrella Policy [Doc. 25 ¶ 65].

#### A. Defendant's Motion for Summary Judgment

Defendant argues that summary judgment in its favor is appropriate in this case because it had no duty to defend Laxmiji in the Underlying Lawsuit, Laxmiji was in material breach of

9

the Umbrella Policy, and the voluntary Consent Judgment is unenforceable against it [Doc. 75].

The parties agree that Tennessee law applies to these arguments. In diversity actions, federal courts must apply the forum state's choice-of-law rules. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Where, as here, an insurance policy lacks an enforceable choice of law clause, "Tennessee courts apply the substantive law of the state in which the policy was issued and delivered." *Standard Fire Ins. Co. v. Chester O'Donley & Associates, Inc.*, 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998). It is undisputed that the Policy was issued and delivered to Laxmiji in Tennessee [Docs. 79-1, 80]; therefore, the Court will apply Tennessee substantive law.

Insurance policies are considered contracts and "are subject to the same rules of construction and enforcement as contracts generally." *Standard Fire*, 972 S.W.2d at 7. Policies should be construed logically and as a whole, and terms should be read for their ordinary meaning. *Id.* "Where an insurance contract is plain and unambiguous, the parties are bound by its terms, and courts cannot under the guise of construction make a new and different contract for the parties." *United States Stove Corp. v. Aetna Life Ins. Co.*, 169 Tenn. 264, 84 S.W.2d 582 (Tenn. 1935). "The insuring agreement sets the outer limits of an insurer's contractual liability. If coverage cannot be found in the insuring agreement, it will not be found elsewhere in the policy." *Standard Fire*, 972 S.W.2d at 7.

To prevail on a breach of contract claim in Tennessee, a party must show "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (internal quotations and citations

omitted). Where, as here, an assignment of an insurance claim occurs, the assignee "has no greater rights than the insured" but rather "steps into the shoes of the assignor and takes his assignment subject to the defenses asserted against the assignor." *Aetna Cas. and Sur. Co. v. Tennessee Farmers Mut. Ins. Co.*, 867 S.W.2d 321, 323 (Tenn. Ct. App. 1993).

"An insurer's duty to defend an action against its insured is determined by the allegations of the complaint." *Glens Falls Ins. Co. v. Happy Day Laundry, Inc.*, 1989 WL 91082 at *5 (W.D. Tenn. Aug. 14, 1989) (citing *Graves v. Liberty Mut. Fire Ins. Co.*, 745 S.W.2d 282, 284 (Ct. App. Tenn. 1987). Plaintiffs' complaint alleges that St. Paul was in breach of contract in two ways. First, the complaint alleges that "Laxmiji informed St. Paul of the Fritzes' claims and St. Paul disclaimed coverage under the Underlying Policy and, thus, materially breached the Underlying Policy" [Doc. 25]. Second, plaintiffs allege that "St. Paul failed to satisfy its obligations pursuant to the Umbrella Policy" [*Id.*].

To support their first assertion, that St. Paul disclaimed coverage of Laxmiji's claim, plaintiffs rely on the depositions of Darlene Giles and Joel Ammons, Customer Service Representatives for MIG. Plaintiffs aver that MIG was responsible for notifying St. Paul of Laxmiji's claim, and, given their agency relationship with St. Paul,[2] their failure to do so effectively amounted to MIG denying coverage of Laxmiji's claim on St. Paul's behalf [Doc. 78].

---

[2] The parties vigorously dispute whether MIG was St. Paul's agent with respect to the Policy. However, the Court need not settle this matter to find summary judgment appropriate for defendant. Even if MIG were an agent of St. Paul with respect to the Policy, the Court nevertheless finds summary judgment is appropriate for defendant.

Even viewing the evidence in a light most favorable to plaintiffs, the record does not support this contention. Instead, the depositions of Mr. Ammons and Ms. Giles make clear that MIG did not disclaim coverage on behalf of St. Paul, but rather their actions reflect a company practice of not alerting an overlying carrier of a claim or suit if the underlying carrier disclaims coverage. Mr. Ammons explained that MIG routinely alerts underlying carriers, in this case Liberty, of claims against them, but that there would be no need to alert an overlying carrier, here St. Paul, if and when the underlying carrier disclaims coverage. He states,

> Our job is to notify [the underlying carrier] of every claim because that's where most of the claims are going to be paid out is the general liability property, that underlying claim. The umbrella goes over these coverages. So if this was accepted, then we would notify the umbrella coverage because there may be a possibility that the limits would exceed what this policy pays out, but if this policy is declined, there's no reason to notify the overlying coverage.

[Doc. 76-6].

Because payment via an Umbrella Policy only occurs once payment by an Underlying Policy had been exhausted, Mr. Ammons testified that it was unnecessary to notify St. Paul of the claim once Liberty disclaimed coverage. Ms. Giles reiterates this, testifying that she did not notify St. Paul, as the overlying carrier, of the Underlying Lawsuit, given her belief that Liberty would not cover the claim [Doc. 79-6]. However, Ms. Giles also made clear that she did not make the substantive determination of whether a policy covered a claim. When asked if she alerted ProPoint or Liberty of her opinion that Liberty would not cover Laxmiji's claim, she answered in the negative and stated that she "[doesn't] make those decisions" [*Id.*]. Therefore, nothing in the record indicates that MIG, on behalf of St. Paul, disclaimed coverage of Laxmiji's claims; rather the evidence shows that MIG took no action based on Liberty's denial of coverage of the Underlying Policy.

12

Moreover, St. Paul did not otherwise breach the terms of the Umbrella Policy by not defending Laxmiji in the Underlying Lawsuit. Plaintiffs, citing *Kelly v. Cherokee Ins. Co.*, 574 S.W.2d 735, 737 (Tenn. 1978), state that "an insurer who has the duty to defend, has timely notice and defends or elects not to defend, is bound by the judgment in such a case as to issues which were or might have been litigated therein" [Doc. 78]. Plaintiffs argue that St. Paul had a duty to defend Laxmiji in the Underlying Lawsuit because the Umbrella Policy states that St. Paul will pay "all sums in excess of the Retained Limit" that arise due to "bodily injury . . . caused by an Occurrence" [Doc. 76-1]. Plaintiffs allege that their injuries fall under this category, and therefore St. Paul was in breach of contract when it did not defend Laxmiji in the Underlying Lawsuit.

This argument is unavailing because the clear language of the Umbrella Policy states that St. Paul's duty to defend was only triggered once the Retained Limit from the Underlying Policy was exhausted. And as discussed below, it never was during the course of the Underlying Lawsuit. Section IIA of the Umbrella Policy outlines the differing circumstances that gave St. Paul either the right, or the right and the duty, to defend Laxmiji in a claim or suit seeking damages [Doc. 76-1]. The Policy makes clear that St. Paul "ha[s] the right, *but not the duty*, to participate in the investigation, settlement or defense of any Claim or Suit seeking damages that would be covered by this policy" prior to the exhaustion of the Retained Limit [*Id.*] (emphasis added). In contrast, once the Retained Limit has been reached, St. Paul then has both the right *and* the duty to defend any claim or suit [*Id.*]. Therefore, the plain language of the Umbrella Policy states that St. Paul's duty to defend was only triggered once Laxmiji's Retained Limit was reached, and before that time it merely had the option to exercise that right.

13

The undisputed facts make clear that the Retained Limit was not exhausted until after the Consent Judgement was entered. Plaintiffs' amended complaint alleges that Liberty disclaimed its coverage of Laxmiji and materially breached the Underlying Policy [Doc. 25]. It is undisputed that Liberty declined to defend Laxmiji in the Underlying Lawsuit, and that Laxmiji's $1 million Retained Limit had not been exhausted at the time the parties entered into the Consent Judgment [*Id.*]. Rather, plaintiffs readily admit that the Retained Limit was only exhausted after Liberty settled with plaintiffs during the current lawsuit [Doc. 78]. Therefore, per the terms of the Policy, and as determined by the allegations of the complaint and the undisputed facts, St. Paul never had a duty to defend Laxmiji in the Underlying Lawsuit.

Because St. Paul had no duty to defend in the Underlying Lawsuit, it is not bound by the Consent Judgment. Under Tennessee law, an insurer is bound by a prior judgment where the insurer had a duty to defend, received timely notice of the underlying lawsuit, and defended or elected not to defend. *Kelly*, 368 S.W.3d at 438 ("The general rule binding an insurer by the terms of an earlier judgment presumes that the insurer has the duty to defend."). And as demonstrated, any duty to defend by St. Paul would only have been triggered in the present litigation, when Liberty's Retained Limit was reached.

Furthermore, the Court finds that the Consent Judgment is unenforceable against St. Paul because it was entered into in violation of the Umbrella Policy. Failure to adhere to the conditions of an insurance contract can serve as a defense to liability against the insured and any third-party seeking to recover under its terms. *See Goodner v. Occidental Fire & Cas. Co.*, 440 S.W.2d 614, 616 (Tenn. Ct. App. 1968) (acknowledging adherence to a no action clause in an insurance policy as a valid condition precedent and thus a defense to liability);

*State Auto Ins. Co. v. Lashlee-Rich, Inc.*, 1997 WL 781896 at * 4 (Tenn. Ct. App. Dec. 22, 1997) (upholding the validity of a voluntary payment clause to deny insurance coverage). Further, third-party rights can be "no greater than those of the insured." *Thurman v. St. Paul Fire and Marine Ins. Co.*, 1985 WL 12896, at *3 (6th Cir. Jan. 29, 1985) (citing *Franklin v. St. Paul Fire and Marine Insurance Co.*, 534 S.W.3d 661, 665 (Tenn. Ct. App. 1975)).

During the course of the Underlying Lawsuit, Laxmiji violated several clauses of the Umbrella Policy. First, the Voluntary Payment clause forbid Laxmiji from voluntarily assuming any obligation covered by the Umbrella Policy without St. Paul's consent. Laxmiji did so by unilaterally agreeing to a $20 million Consent Judgment [Doc. 76-19].[3] Further, the No Action Clause required that St. Paul agree to damages owed, or that those amounts be

---

[3] In defendant's statement of undisputed facts, defendant asserts that it did not consent to the Consent Judgment in the Underlying Lawsuit [Doc. 76]. Plaintiffs dispute this on the basis of *Dick Broadcasting Company, Inc. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653 (Tenn. 2013) [Doc. 80 ¶ 52]. Plaintiffs, however, do not explain their reasoning, either in their response to defendant's statement of facts, their motion for summary judgment, or their response to defendant's motion for summary judgment. Accordingly, this is an undeveloped argument that must fail. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to. . . put flesh on its bones." (internal quotations omitted)); *see also* E.D. Tenn. L.R. 7.1(b) (requiring parties to provide the Court with the "legal grounds which justify the ruling sought from the Court").

Moreover, the Court fails to understand plaintiffs' citation, as that case primarily deals with implied covenants of good faith and fair dealing, as well as rights of first refusal in contracts. The court in *Dick Broadcasting* does state, however, that "the implied obligation of good faith and fair dealing does not create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." *Dick Broadcasting*, 395 S.W.3d at 666. Therefore, to the extent that plaintiffs imply that defendant breached its obligation of good faith and fair dealing by not consenting to the Consent Judgment, the plain language of the Umbrella Policy clearly states that defendant had no duty to defend until the Retained Limit was exhausted. Because the Limit was unexhausted at the time of the Consent Judgment, defendant had no duty to participate in or consent to the Consent Judgment, and, as such, no obligation of good faith or fair dealing was breached.

determined at trial [*Id.*].  However, Laxmiji voluntarily assumed liability for $20 million in damages through a Consent Judgment and without St. Paul's blessing [*Id.*].  Plaintiffs do not contest St. Paul's argument that Laxmiji violated these clauses—they merely state that because St. Paul refused its duty to defend Laxmiji in the Underlying Lawsuit, Laxmiji did not have to perform its own obligations under the contract [Doc. 78].  However, as discussed above, St. Paul did not have a duty to defend Laxmiji in the Underlying Lawsuit; therefore, Laxmiji retained its obligations under the Umbrella Policy, which it then breached.  The Court therefore finds that the Consent Judgment was entered into in violation of the Umbrella Policy, thus giving St. Paul a defense to liability.  Moreover, this defense can be asserted against the Fritzes, as their rights are no greater that Laxmiji's.

Even viewing the evidence in a light most favorable to plaintiffs, the Court finds that summary judgment is appropriate for defendant.  Plaintiffs have failed to demonstrate a genuine dispute of material fact demonstrating defendant was in breach of the Umbrella Policy.  Moreover, the Consent Judgment is unenforceable against defendant, as it was done in violation of the clear terms of the Umbrella Policy.  And because the Fritzes' rights can be no greater than Laxmiji's the Court finds that plaintiffs cannot enforce the Consent Judgment against St. Paul.  Defendant's motion for summary judgment [Doc. 74] will therefore be granted.

**B.     Plaintiff's Motion for Summary Judgment**

Because summary judgment is appropriate for defendant, the Court will deny plaintiffs' motion for partial summary judgment [Doc. 72].

## IV. Conclusion

For the reasons set forth above, the Court will **GRANT** defendant's Motion for Summary Judgment [Doc. 74]. Because summary judgment is appropriate for defendant, the Court will **DENY** plaintiffs' motion for partial summary judgment [Doc. 72].

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE